BCCI HOLDINGS (LUXEMBOURG), SOCIETE ANONYME, et al., Plaintiffs,

v.

Abdul Raouf Hasan KHALIL, et al., Defendants.

No. Civ.A. 95–1252(JHG).

United States District Court, District of Columbia.

June 23, 1999.

---

Michael Nussbaum, Ropes & Gray, Washington, DC, Jeffrey David Robinson, Eric Leslie Lewis, Anne Katherine Toomey, Stacy Allison Feuer, Baach, Robinson & Lewis, Washington, DC, for plaintiffs.

James P. Linn, Stephen R. Johnson, Linn & Neville, Oklahoma City, OK, for Abdul Raouf Khalil, defendant.

## OPINION AND ORDER

JOYCE HENS GREEN, District Judge.

In July 1991, banking regulators around the world seized the corporations collectively known as the Bank of Credit and Commerce International ("BCCI"), uncovering the largest international bank failure in history. Eight years later, the effort to determine how the BCCI debacle happened and who is responsible for the fraud remains ongoing. This lawsuit, brought by the court-appointed Liquidators of the BCCI Group emerged out of that process.[1]

---

1. The "BCCI Group" and "BCCI," as used herein, refer collectively to BCCI Holdings (Luxembourg) S.A. ("BCCI Holdings"), its two operating subsidiaries, Bank of Credit and Commerce International S.A. ("BCCI S.A."), Bank of Credit and Commerce Inter-

The defendants are two individuals, Abdul Raouf Hasan Khalil ("Khalil") and Syed Ziauddin Ali Akbar ("Akbar"), and two companies owned and controlled by Khalil and Akbar—Capcom Financial Services Limited ("Capcom UK"), and Capcom Futures Inc. ("Capcom US"). Only Khalil contested this suit; Akbar and the corporations have defaulted.

Khalil is extremely wealthy, and was perhaps the largest depositor in BCCI. In 1987, Khalil withdrew nearly $100 million in deposits and interest from BCCI. The Liquidators did not contest Khalil's right to the deposited funds. What the Liquidators do claim is that in the late 1970s and early 1980s, BCCI's former management approached Khalil, offering to pay him handsomely for the use of his name and prestige to disguise three fraudulent schemes. According to the Liquidators, Khalil agreed to:

(1) act as a nominee shareholder of the parent corporation of First American Bank—once the largest bank in Washington, D.C.—to disguise the fact that BCCI had illegally acquired an American bank without proper regulatory approval;

(2) act as a nominee shareholder of BCCI Holdings to disguise the fact that BCCI had considerably less capital and support than was represented to depositors, regulators, and the public; and

(3) allow his name, and that of his companies, to be used by BCCI's investment arm to disguise BCCI's risky investments and to give the appearance that certain sizable loans were being serviced when, in truth, they were in default.

The Liquidators further alleged that BCCI directly paid Khalil nearly $30 million for this use of his name and that he reaped substantially more by less direct means. The Liquidators alleged that if Khalil had not allowed his name and prestige to be used to disguise BCCI's true financial condition, the bank would have been closed down much sooner, preventing significant financial losses to thousands of creditors and depositors.

Separately, the Liquidators also alleged that Khalil conspired with Akbar—a BCCI insider who managed the bulk of BCCI's assets until 1986—to create a commodities brokerage, Capcom, through which Khalil and Akbar further siphoned substantial BCCI assets.[2]

national (Overseas) Limited, ("BCCI Overseas"), and three affiliate companies, ICIC Holdings Limited ("ICIC Holdings"), International Credit and Investment Company (Overseas) Limited ("ICIC Overseas"), and Credit and Finance Company Limited ("CFC").

As is discussed more fully below, after BCCI's operations were brought to a halt, the courts in the United Kingdom, Luxembourg, and the Cayman Islands with supervisory authority over the various BCCI Group entities appointed Liquidators to wind up the affairs of the corporations. The Liquidators of BCCI Holdings, BCCI SA, BCCI Overseas, ICIC Overseas, ICIC Holdings and CFC are sometimes referred to, collectively, as the Court Appointed Fiduciaries. The plaintiffs in this lawsuit are the corporations, but for the sake of convenience the Court will refer to the plaintiffs as the "Liquidators." *Cf. United States v. BCCI Holdings (Luxembourg) S.A.*, 48 F.3d 551, 554 (D.C.Cir.1995) ("bank liquidator ... stands in the shoes of the bank it represents ..."), *aff'g*, 833 F.Supp. 22 (D.D.C.1993). The legal claims asserted in

this lawsuit represent "assets" of the corporations in the view of the Liquidators. This lawsuit was brought to "liquidate" those assets.

2. The Liquidators sought to establish Khalil's liability for these schemes under seven legal theories. Count I alleges racketeering under RICO based upon Khalil's acquisition of a nominee interest in First American. The predicate acts constituting the pattern of racketeering include wire and mail fraud, violations of the Travel Act, financial institution fraud and money laundering. Count II also is a civil RICO count, alleging racketeering in connection with the capitalization and operation of the BCCI Group through manipulation of BCCI balance sheets, including fraudulent transactions using U.S. bank accounts and U.S. wires. Counts III and IV allege RICO violations based upon the defendants' investment in and operation of the Capcom entities, which was accomplished through the diversion of funds from the BCCI Group to Khalil and Akbar through wire and mail fraud, mon-

Shortly after the complaint was filed, Khalil moved for dismissal. That motion was denied. *See BCCI Holdings (Luxembourg) S.A. v. Khalil,* 20 F.Supp.2d 1, 7 (D.D.C.1997). After lengthy discovery this case was set down for a bench trial. Khalil moved for trial by jury under Rule 39(b) of the Federal Rules of Civil Procedure. That motion also was denied. *See BCCI Holdings (Luxembourg) S.A. v. Khalil,* 182 F.R.D. 335, 340 (D.D.C.1998). Trial to the Court commenced on January 25, 1999 and continued on January 27, January 28, February 1 and February 11, 1999.

 This Opinion and Order constitute the Court's findings of fact and conclusions of law as required by Rule 52(a) of the Federal Rules of Civil Procedure.[3] Any conclusions of law that constitute findings of fact or findings of fact that constitute conclusions of law shall be considered

ey laundering and violations of the Travel Act. Counts V, VI and VII allege common law fraud, unjust enrichment, and conversion, respectively.

3. The findings of fact herein are subject to differing standards of proof. As to the civil RICO counts, it appears that facts are to be proven by a preponderance of the evidence. *See Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 491, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985) (appearing to endorse a preponderance standard); *Richards v. Combined Ins. Co. of Am.,* 55 F.3d 247, 249 (7th Cir.1995) (preponderance standard applies to all elements of a civil RICO claim); *cf.* H.R. 1717, 102d Cong., 1st Sess. §§ 4–6 (1991) (proposed legislation requiring clear-and-convincing standard for civil RICO claims). However, the Liquidators' claim of common law fraud in Count V requires clear and convincing evidence. *See Hercules & Co., Ltd. v. Shama Restaurant Corp.,* 613 A.2d 916, 923 (D.C. 1992).

In this case, the difference in standards is immaterial as all of the findings of fact herein are supported by clear and convincing evidence. The Liquidators and Khalil agreed on many of the "contextual facts." For instance, they agreed that former management of BCCI engaged in massive fraud, and that defendant Akbar played a pivotal role in that fraud. The central issues at trial focused on what Khalil knew about the fraud and the extent to which he participated in its perpetration. The Liq-

as having been determined accordingly. Having considered all the evidence, arguments, the parties' proposed findings of fact and conclusions of law, and the entire record in this matter, the Court will enter judgment in the amount of $388,402,534, not including attorneys' fees or costs, in favor of the Liquidators on Counts I, II, III, V, VI, and VII. The Liquidators did not meet their burden on Count IV. Pursuant to 18 U.S.C. § 1964(c), the damages are trebled to $1,165,207,602.

## I. DRAMATIS PERSONAE

### A. Agha Hasan Abedi

BCCI was the brainchild of Agha Hasan Abedi ("Abedi"), who, in 1972, established what he hoped would become an international Islamic bank. Initially, BCCI grew according to plan. Until taken under control by authorities around the world on

uidators presented substantial documentary and testimonial evidence demonstrating that Khalil was a knowing and willing participant in the fraudulent schemes alleged. Khalil responded to many of the central allegations with only his own testimony, unsupported by documents that he claims once existed. Khalil's testimony was discredited in critical respects by internal inconsistencies and by substantial contradictory evidence from other sources.

On a separate note, a great deal of the testimony in this case consisted of designated portions of deposition testimony. The Court received full transcripts marked to show where designations begin and end. In certain instances, one or both parties' designations begin with questions and answers that follow on from the immediately preceding question and answer. The Court asked the parties to consider whether she could treat as evidence those peripheral questions and answers "which ought in fairness to be considered with the part introduced." *Cf.* FED.R.CIV.P. 32(a)(4). The parties responded, correctly, that they ought to have the opportunity to know precisely which portions of undesignated testimony the Court had in mind, and an opportunity to be heard, before such testimony could be treated as evidence. Because the importance of the peripheral questions and answers was itself peripheral, the Court relied only on those portions of testimony admitted into evidence when reaching her findings of fact and conclusions of law.

July 5, 1991, the BCCI Group operated a coordinated international banking network, which at its peak had more than 400 branches in approximately 70 countries. The BCCI Group consisted of a number of corporate entities, including the corporate plaintiffs enumerated herein.[4] The BCCI Group's international banking network included offices in several of the United States, including the State of New York. Abedi served as the top corporate officer of the BCCI Group from 1973 until 1988, when he suffered a heart attack. Abedi did not testify in this trial. Indeed, the Court heard evidence that Abedi is deceased. *See* Trial Transcript ("Tr.") (Testimony of Christopher Morris, UK-appointed Liquidator) at 136–37.[5]

## B. Swaleh Naqvi

Abedi's chief lieutenant in the bank was Saiyid Mohammad Swaleh Naqvi ("Naqvi"), who succeeded Abedi in 1988. Naqvi remained in the senior executive position in the BCCI Group until 1990, when control of the BCCI Group formally passed to the sovereigns of Abu Dhabi. Naqvi served time in prison in Abu Dhabi before coming to the United States to plead guilty to charges here. He presently is incarcerated in FCI Allenwood, Pennsylvania. As part of his plea agreement, Naqvi agreed to cooperate with regulatory and law enforcement authorities attempting to unravel the intricacies of the rise and fall of BCCI. As with most of the fact witnesses in this case, Naqvi testified by deposition. *See* Fed.R.Civ.P. 32(a)(3) (listing circumstances in which deposition testimony may substitute for live testimony at trial).[6] Naqvi was deposed in this case and in the *First American* case willingly; he did not understand that his plea agreement required him to testify in either case.

## C. Imran Imam

Scrivener to the fraud was Imran Mohammed Ahmad Imam ("Imam"). Imam was a BCCI officer who assisted Naqvi from 1977 to 1991. Imam's principal assignment was to maintain records of transactions. For example, BCCI extended loans to the individuals who became the record shareholders of First American's parent corporation. Some of these loans were genuine extensions of credit, secured only by the shares; other "loans" were created to disguise BCCI's direct equity investment in First American. Imam kept detailed records of these transactions. Financing for the record shareholders of BCCI Holdings was done in similar fashion, and Imam kept records concerning the holdings of both the genuine investors and the nominees. Imam testified through deposition in this case. Khalil's counsel declined the opportunity to attend and cross-examine him.

---

**4.** BCCI Holdings was at relevant times a holding company incorporated under the laws of Luxembourg. BCCI SA was at relevant times a banking corporation organized under the laws of Luxembourg. BCCI Overseas was at relevant times a banking corporation organized under the laws of the Cayman Islands. ICIC Overseas was at relevant times a banking corporation organized under the laws of the Cayman Islands. ICIC Holdings was at relevant times a corporation organized under the laws of the Cayman Islands. CFC was at relevant times a banking corporation organized under the laws of the Cayman Islands.

**5.** In a separate, criminal case pending in this Court, *United States v. BCCI Holdings (Luxembourg) S.A.*, Crim. No. 91–0655 (Def.No.5) (D.D.C.), charges against Abedi remain pending because the United States has not been able to determine for sure whether he is deceased.

**6.** Naqvi's testimony came in through his deposition in this case, and his deposition in a separate case brought by First American Corporation in which Khalil also was a defendant. *See generally First American Corp. v. Al–Nahyan*, 17 F.Supp.2d 10 (D.D.C.1998) [That case is referenced herein as *"First American"* or *"FAC."*]. Due to the overlapping allegations, many of the witnesses in this case also were deposed in *First American*. Shortly before the jury trial in *First American* was set to commence on October 5, 1998, all but two defendants had settled. The claims against Khalil and the remaining defendant were dismissed, obviating the need for trial.

#### D. Ziauddin Akbar

Defendant Akbar was a BCCI officer from approximately 1976 to 1986 and was in charge of BCCI's Treasury Division from 1982 to 1986. As head of the Treasury Division, Akbar was responsible for managing and investing BCCI's funds. Additionally, Akbar was the account officer for certain major customers of BCCI, including Khalil. At trial, Khalil and the Liquidators agreed that Akbar was central to most of the schemes alleged in the complaint, a rogue *extraordinaire* principally responsible for establishing shell corporations to engage in sham transactions so as to misrepresent BCCI's economic situation to the world, gambling BCCI's assets in the commodities markets and disguising losses therefrom, transferring large sums of money in and out of shell corporations in which he had an undisclosed interest, and other illegal activities. After huge losses in the Treasury operations came to light internally, Akbar left BCCI in 1986. He continued to receive a salary for some time thereafter.

After leaving BCCI, Akbar engaged principally in managing investment and financial trading businesses, acting as both the behind-the-scenes manager of Capcom—his joint venture with Khalil—as well as manager of his own London-based Futures Advisory Services ("FAS").

In 1988, authorities in the United States arrested Akbar in connection with allegations that General Manuel Noriega's drug money was being laundered through BCCI and Capcom. Although other BCCI employees were convicted in connection with those allegations, it appears that Akbar and Capcom U.S. were cleared. However, in September 1993, after BCCI had been seized, Akbar pled guilty to 16 counts of false accounting in the United Kingdom.

Akbar was released from prison in the United Kingdom during the pendency of this litigation and returned to Pakistan. Akbar was deposed in Pakistan in both this case and in *First American*. Those deposition transcripts were introduced at trial.[7]

7. In his depositions, Akbar was laconic. The Liquidators sought to embellish Akbar's deposition testimony with statements he made to the London Police's Serious Fraud Office ("SFO") in 1993. Akbar's statements in these interview sessions were not sworn, but the interview was taped and transcribed. At the time Akbar gave this interview, it appears that he had been granted limited immunity for statements made during the interview by prosecuting officials in the United Kingdom, but not by federal and New York prosecutors in the United States, who also attended and participated in the SFO interview sessions.

Prior to trial, Khalil moved *in limine* to prevent the Liquidators from introducing any of Akbar's statements to the SFO as inadmissible hearsay. The Liquidators opposed the motion on the theory that Akbar had incorporated some of these statements into his deposition testimony. The Court rejected that theory of admissibility, *see Khalil*, 184 F.R.D. 3, 8 (D.D.C.1999), but left open the possibility that some statements may be admissible as recorded recollections under Rule 803(5) of the Federal Rules of Evidence. *See id.* Embracing the Court's suggestion, the Liquidators proffered a limited number of Akbar's statements to the SFO to be admitted as recorded recollections. Over Khalil's objection the Court ruled these statements would be admissible. *See* Mem.Op. and Order of Jan. 21, 1999 at 4. In the January 21, 1999 Order, the Court also provided Khalil with an opportunity to counterdesignate any portions of the same SFO statements that he thought, in fairness, should be included to put those portions proffered by the Liquidators in context. *Cf* Fed.R.Civ.P. 32(a)(4) (allowing for counterdesignation of deposition testimony at trial).

Going far beyond contextualization, Khalil's counsel proffered numerous portions of Akbar's SFO statements from different interview sessions on different topics. Most of these statements were hearsay, falling considerably outside the recorded recollections proffered by the Liquidators. At the opening of trial, the Court observed that Khalil's proffer would be taken in as evidence in his case rather than as an enhancement of the evidence offered by the Liquidators. *See* Tr. at 2–3. The Liquidators chose not to object to Khalil's proffer on hearsay grounds, asking only to be allowed to counterdesignate from the interview sessions proffered by Khalil. The Court granted that request.

Rule 803(5) requires that recorded recollections be read into the record rather than received in documentary form, regardless of

## E. Abdul Khalil

Defendant Khalil is a citizen and resident of Saudi Arabia. He has been married for 36 years to Taheya Badeeb, with whom he lives in Jeddah, Saudi Arabia along with their two sons, daughter, and grandchildren. Khalil was educated in Saudi Arabia and Cairo, Egypt, where he studied history. Khalil developed a passion for museums and antiquities which he has pursued throughout his adult life.

When growing up, Khalil stood out as one of the brightest students in his class. After he completed school, he was one of a select group recruited to be trained in electronics and air traffic control at Dharan Air Force Base in Saudi Arabia. While at the base, Khalil alone was selected to work with United States Air Force personnel. Through that contact, Khalil learned English.[8]

Upon completion of his training, Khalil served as an air traffic controller for the Civil Aviation Department of Saudi Arabia and an instructor of air traffic control. He also was recruited to perform air traffic control duties during Saudi Arabia's war with Yemen. After 22 years of service, Khalil retired and entered the real estate business. For reasons not entirely clear from the record, the real estate market in Saudi Arabia surged in such a way as to allow phenomenal profits—such as a 400 million riyal return on a 14 million riyal investment (plus the cost of improvements) within a short period. Through such dealings, Khalil became extremely wealthy.

As is detailed below, Khalil deposited millions of dollars, in various currencies, in BCCI in the late 1970s and early 1980s.

He withdrew those deposits, plus interest, in 1987, but he maintained contact with BCCI beyond that period. After BCCI was seized, Khalil came to London voluntarily to be interviewed by the SFO in connection with its investigation of Akbar. Unlike most of the other persons closely associated with BCCI, Khalil was not criminally charged, either in the United Kingdom or the United States. However, the Board of Governors of the Federal Reserve did bring an administrative enforcement action against Khalil in connection with his record shareholding in the parent corporation of First American. Although, in September 1992, Khalil granted Federal Reserve investigators an interview in his home in Saudi Arabia, and although, in June 1997, Khalil did travel to the United States to be deposed in *First American*, Khalil has not formally been served with the Federal Reserve's administrative charges, which remain pending.

At present, Khalil is in poor health. He spends considerable time working on his projects, including a huge museum filled with more than 60,000 antiquities, which he and his family have donated to the poor. Another project, Altayebat City, consists of classrooms, shops and 20 different museums to train, educate, clothe and feed the poor.

Due to poor health, Khalil's deposition in this case was postponed, and was taken well after discovery had closed. Because it appeared likely that Khalil would be unable to appear at trial, the Liquidators videotaped the deposition to allow the Court to see, hear and observe Khalil's demeanor. Most of the 800–page tran-

whether trial is to a jury or to the Court. That was done. As a result, citations to the trial transcript referring to Akbar's testimony reference these SFO statements.

By opting to introduce numerous hearsay statements by Akbar to the SFO, the Court finds that Khalil did not preserve his hearsay objection to the Liquidators' original proffer. But even if he had, Akbar's SFO statements were unnecessary to the findings herein. Although some of those statements have been

cited below, independent evidence supports all of the Court's findings and conclusions, all of which would be the same even if none of Akbar's SFO statements had been admitted. Given Akbar's obvious biases and his role at the center of the fraud, the Court gave little weight to any of his testimony.

8. At the time his deposition was taken in this case, Khalil demonstrated a working command of English, although he occasionally sought clarification from an interpreter.

script was admitted into evidence, along with the videotaped version in CD–ROM format.[9] The Court regrets that Mr. Khalil was unable to testify in person at trial.

### F. Kamal Adham and Sayed Jawhary

Khalil's success in school and in the civil service brought him to the attention of Sheikh Kamal Adham ("Adham"). Adham had been an advisor to, and was a relative of, King Faisal. Adham came to work for the King's son, Prince Turki, who served as chief of the Foreign Liaison Bureau and Chief of Intelligence. Adham recruited Khalil to work in the Foreign Liaison Bureau as Adham's personal assistant, gathering and analyzing news media articles from other countries regarding Saudi Arabia.[10] Khalil also started his own communications company designing satellite communications systems for the government of Saudi Arabia while working at the Foreign Liaison Bureau. Khalil worked in the Saudi Government with Adham for 16 years.

Another close associate of Adham and Khalil was Sayed Jawhary ("Jawhary").[11] Jawhary is a resident of Saudi Arabia, who has worked for Adham as a financial advisor since 1957. At relevant times, Jawhary also provided financial advice to BCCI, for which he was well compensated. Jawhary did not disclose the existence or terms of this side arrangement to either Adham or Khalil.

Adham, Khalil, and Jawhary had a number of business dealings in common. On occasion, Khalil undertook real estate transactions on Adham's behalf. The three kept each other apprised of investment opportunities. It was Adham who suggested to Khalil that he deposit money with BCCI. Also at Adham's invitation, Adham, Khalil and Jawhary became record shareholders of Credit and Commerce American Holdings, N.V. ("CCAH"), the ultimate parent corporation of First American Bank.[12] First American operated in multiple states in the United States, with its principal place of business being the District of Columbia.

### G. Capcom

Khalil, through Akbar, invited Adham and Jawhary to become record shareholders in defendant Capcom UK, a United Kingdom corporation incorporated in 1984 which was at all relevant times a broker-dealer in futures, options and commodities. In addition to being a shareholder, Khalil also was a director of Capcom UK.

9. The CD–ROM format is indexed by deposition pages and lines, allowing the viewer to quickly find a desired portion of testimony. In addition, the presentation uses a split screen, displaying the video portion on the left and the transcript on the right. The Court was able to see and hear Khalil's testimony, judge his demeanor, and, on occasion, refer to the transcript on the screen when Khalil's English pronunciation was not immediately intelligible.

10. The complaint alleges that Adham was Chief of Intelligence and that Khalil was his deputy. Some evidence and argument supports this allegation. *See, e.g.,* Jawhary Dep. (*BCCI*) at 191 ("Mr. Khalil is a security man, not an accountant, . . ."); *see also* Tr. at 21 (Mr. Linn's opening argument). Because the exact nature of Khalil's role in the Foreign Liaison Bureau is immaterial to this dispute, the Court leaves the issue open.

11. Subsequent to many of the relevant events, Jawhary changed the English spelling of his name. In many documents he is referred to as "E.E. Eljawhary." or as "Mr. Gohary."

12. CCAH is a Netherlands Antilles Corporation, which was a bank holding company pursuant to the Bank Holding Company Act, 12 U.S.C. § 1841 *et seq.* Credit and Commerce American Investment B.V. ("CCAI") is a Netherlands corporation and was a wholly-owned subsidiary of CCAH. CCAI was also a bank holding company pursuant to the Bank Holding Company Act. CCAH and CCAI were formed in 1978 to acquire control and ownership of Financial General Bankshares Inc. ("FGB"), a Virginia corporation and a bank holding company within the meaning of the Bank Holding Company Act. The acquisition was completed in 1982 when CCAI acquired First American Corporation ("FAC"), a Virginia corporation, which in turn acquired FGB, which was subsequently renamed First American Bankshares, Inc. ("FAB").

Capcom UK formed a subsidiary in the United States, Capcom US, to trade on the Chicago Board of Trade. Capcom U.S. is an Illinois corporation incorporated in 1985, which was at all relevant times a broker-dealer in futures, options and commodities. At relevant times, defendant Capcom UK was the registered owner of 82 percent of the shares of Capcom US. Capcom UK also formed another wholly-owned subsidiary, Brenchase Limited, which was incorporated in the United Kingdom.

After the collapse of BCCI, Adham and Jawhary pled guilty to charges brought by the United States and the State of New York for their respective roles as nominee shareholders in BCCI's acquisition of First American. In lieu of incarceration, Adham agreed to pay a fine of $105 million and Adham and Jawhary agreed to cooperate with law enforcement authorities in their investigations of BCCI's collapse.

### H. The BCCI Liquidators

On July 5, 1991, banking regulators in the United Kingdom, Luxembourg, and the United States froze assets owned or controlled by BCCI Holdings, BCCI SA, BCCI Overseas, and ICIC Overseas. By the end of July 1991, officials in 44 countries had closed down BCCI branches and operations in their jurisdictions.[13] Commencing in January 1992, the various plaintiff companies were placed into full liquidation and the Court Appointed Fiduciaries were appointed. BCCI Holdings was placed into liquidation in June 1992. ICIC Overseas was placed into liquidation in April 1992 and ICIC Holdings was placed into liquidation in July 1993.[14]

In denying Khalil's motion to dismiss, this Court recognized the validity of the Liquidators' appointments and their powers to act on behalf of the plaintiff corporations in this case. *See Khalil*, 20 F.Supp.2d at 4–5. For the reasons previously cited, and for those advanced by the Liquidators at trial, the Court holds that the Liquidators have standing to bring this action.

### I. Additional Witnesses

The Court also received deposition testimony from a number of former officers, directors, or employees of Capcom. Khalil also presented deposition testimony from prosecutors in the United Kingdom con-

---

**13.** On or about July 5, 1991 in England, the Secretary of State for Trade and Industry appointed provisional liquidators over the United Kingdom branches of BCCI SA, subject to the supervision of the High Court of Justice in England. On or about July 8, 1991, in Luxembourg, at the petition of the Institute Monetaire Luxembourgeois ("IML"), the Luxembourg court placed BCCI S.A. into "gestion controllee" (controlled management) and appointed a commissaire (commissioner). On or about July 22, 1991 in the Cayman Islands, the Grand Court of the Cayman Islands appointed provisional liquidators over BCCI Overseas and certain Cayman entities, including ICIC Overseas and ICIC Holdings. On or about August 1, 1991, in Luxembourg, at the petition of the IML, the Luxembourg court also placed BCCI Holdings into "gestion controllee" and appointed commissaires. Provisional liquidation and "gestion controllee" are interim insolvency procedures that enable the assets of an entity to be protected pending the hearing of the application to wind up or liquidate the company.

**14.** The liquidations of the plaintiff corporations are closely interrelated. A Board of Liquidators, consisting of the Liquidators appointed by the Courts in England, the Cayman Islands, and Luxembourg, coordinates global asset recovery efforts. The activities of the Board of Liquidators are conducted pursuant to various agreements, including pooling agreements, which provide for the pooling of assets of the BCCI Group and the ICIC entities to ensure that all admitted creditors of any BCCI Group or ICIC entity receive an equal pro rata dividend.

The liquidation structure, which is implemented pursuant to the supervision and authority of the appointing courts, reflects the interrelationship of the various BCCI Group entities. Throughout its existence, the BCCI Group operated under the overall management and authority of a single group of senior officers with common boards of directors and centralized operations.

cerning their opinion of Khalil's and Akbar's relative culpability.

The Court also received live testimony from Christopher Morris, one of the English Liquidators; John Gilkes, an English forensic accountant assisting the Liquidators; Dr. Audrey Giles, the Liquidators' expert in forensic document examination; Richard Small, Assistant Director of Banking Supervision and Regulation for the Board of Governors of the Federal Reserve System; and Irving Beimler, the Liquidators' expert in credit and lending.

## J. Documentary Evidence

To prove their case, the Liquidators relied at trial on BCCI's records documenting Khalil's relationship with the bank. Although the corrupt former management of BCCI used the bank to carry out fraudulent schemes from an early point in its history, in many other respects BCCI operated as a normal business. Account ledgers were maintained. Deposits, withdrawals, wire transfers, and other transactions were documented in the normal course of business. The BCCI Group followed industry custom in its numerous dealings with banks in the United States and around the world. Large, prestigious accounting firms audited the records of the various BCCI entities, and certified to the public for many years that all was above board. Indeed, among other reasons, it is because BCCI operated as a normal business in so many respects that it took banking regulators around the world so long to discover the massive fraud that was masked by the surface normalcy.

Some of BCCI's records concerning Khalil, and Khalil-owned companies, document real transactions as they occurred.

The parties agree that many other BCCI records concerning Khalil evidence sham transactions. It appears that the former management of BCCI relied primarily on use of Khalil's name and the names of Khalil-owned companies to disguise fraudulent transactions in the Treasury Division. On documents reflecting false transactions, and occasionally on those reflecting real transactions, Khalil's name was often signed by Akbar or another BCCI employee. At trial Khalil objected on authenticity grounds to most of the Liquidators' exhibits. The Court admitted the exhibits into evidence provisionally on condition that the Liquidators lay a foundation for their admission. That was done.

To distinguish appearances from economic reality, the Liquidators relied on two experts. Dr. Audrey Giles ("Giles") testified as to which signatures on key documents appeared to be Khalil's genuine signature. Khalil did not offer a competing expert, and the Court finds Dr. Giles' testimony to be credible and unrebutted.[15] The Court finds that all of the signatures Dr. Giles testified to have been more likely Khalil's than not, were in fact Khalil's signatures. The Liquidators also relied on John Gilkes ("Gilkes"), who sifted through numerous documents recovered from BCCI and checked these against available outside sources to separate fact from fiction in the story told by the BCCI documents.

## II. KHALIL'S DEPOSIT RELATIONSHIP WITH BCCI

In or about 1975, Sheik Adham told Khalil he had a "very good bank" in England, and suggested to Khalil that he put his money in BCCI because the real estate

---

**15.** In essence, Khalil testified as his own opinion witness as to handwriting. On repeated occasions, when Khalil was asked whether or not he had signed a document, he either soliloquized on a different topic, or asked to see the original signature to decide how closely it resembled his signature. Only in rare instances would he testify as to whether he remembered seeing and/or signing the document. With respect to signatures that he claimed were forgeries, Khalil gave names to the different styles that he identified. *See, e.g.,* Khalil Dep. (*BCCI*) at 664 (classifying allegedly forged signatures as "face, flying alone, flying with underline . . . copying black ink .. black ink with dash . . . and flying face").

market in Saudi Arabia was "quiet." Khalil's practice up to that point, like many living in Saudi Arabia, had been to keep his substantial wealth in cash, primarily in Saudi currency, locked in a strong room inside his house. Khalil testified that one reason that Saudis generally do not use banks is that the Koran places restrictions on followers of Islam from keeping interest earned on deposits. In any event, in or about 1977, Khalil began his banking relationship with BCCI. While in London, Khalil signed account opening forms, but did not deposit any funds at that time. Approximately three weeks later, representatives of BCCI came to Khalil's house in Jeddah to collect the first deposit.

The details of how much Khalil deposited with BCCI are of critical importance. The Liquidators alleged that Khalil took from BCCI far more than that to which he was entitled. Khalil countered that his relationship with BCCI was economically detrimental, and that money he admits receiving from BCCI—nearly $100 million in deposits and $27.5 million in direct payments—was due and owing to him. At the root of this dispute is a disagreement over the amount Khalil initially placed with BCCI and where it was kept.

On this important point, Khalil's recollection of the details changed between his deposition in the *First American* case and his deposition in this case. In this case, Khalil testified that a representative of BCCI who worked in Adham's office in Jeddah came to pick up his first deposit:

Q: So you give a gentleman from the representative office in Jeddah?

A: Yes.

Q: 10 suitcases?

A: 10 suitcases.

Q: Saudi riyal cash?

A: 50 million more or less, total.

Q: Did you count the money before you put it in the suitcases?

A: It is there. Always when I sell something I take money from the people so I do accounting. I have three different suitcase. If this is the big—

THE INTERPRETER: 150 notes.

A: If this big one, you know, you don't have big size, maybe you can put $10 million, maybe 50 maybe I can put 7 million. Maybe if it's smaller I put five million in the suitcase, because it takes size like that. So I already count it. It is there. He's been most of the day counting the money there.

Q: Were you with him when he counted the money?

A: Oh, yes, oh, yes.

Khalil Dep. (*BCCI*), Nov. 16, 1998, at 22–23.[16]

In his *First American* deposition, taken 18 months earlier, Khalil had testified that it was Akbar who came to take the first deposit, that the money was not prepacked, but put into Samsonite suitcases in Akbar's presence, that there were 11 suitcases instead of 10, and that he would have deposited more, but he ran out of suitcases. *E.g.*, Khalil Dep. (*FAC*), June 4, 1997, at 11, 28, 41, 44–48, 69–70, 73–76. Khalil testified that he made one or two comparably large deposits via suitcase, along with periodic deposits in smaller amounts. *E.g.*, Khalil Dep. (*BCCI*) at 100–01. There are some discrepancies between his two depositions regarding these additional deposits.

In other respects, Khalil's testimony concerning his deposits was largely the same in both depositions. For example, Khalil testified that although all the cash deposited came from money in his house, some of it belonged to partners whose identity he could not reveal. *See, e.g.*, Khalil Dep. (*BCCI*), Nov. 16, 1998, at 30–33. Khalil stated that money placed in term deposit accounts was jointly owned by these unnamed partners, and that mon-

---

**16.** This quotation, and all others herein, are verbatim from the transcripts. Spelling, grammatical, and syntactical errors are as presented in the transcripts.

ey placed in current accounts belonged solely to Khalil. Whether these partners in fact existed is immaterial because in any event Khalil had sole authority to transact business with these funds.

Also, in both depositions Khalil testified that his first deposit was to be divided to pay for BCCI shares he had agreed to purchase, to be placed in term deposits (a.k.a. deposit accounts), and a substantial sum to be placed "in the hand" of Akbar, which would be immediately available to pay expenses as Khalil may from time to time direct.

At trial, Khalil acknowledged through his counsel that the BCCI documents reflecting the total amounts deposited by Khalil show his deposits falling far short of the amount Khalil withdrew and received from BCCI. Khalil's first line of defense was that the Court should disregard those records as being fabricated, falsified, and incomplete. Along these lines, Khalil asserted that he had deposited more with BCCI than the records reflect. The only evidence offered to support this assertion was his own testimony.

The Court cannot agree with Khalil's assertion. It is telling that Khalil's counsel, when offering Khalil's version of how much he placed with the bank, was forced to argue from stray recollections by Naqvi and Akbar, e.g., Khalil's Prop. Findings ¶ 13, because Khalil—who well remembered sums involved in real estate transactions more than 20 years past—testified as to having only a vague recollection and no independent records to establish that he had placed more with BCCI than is shown in the records on which plaintiffs rely.

The Court finds that at the time Khalil handed over suitcases of cash, he received a receipt. See Khalil Dep. (FAC), June 4, 1997, at 69–70. The Court also finds that Khalil kept his own record of the amount deposited. Before the money was turned over, it was counted in a day-long exercise.

Even if there had been no receipt, Khalil knew precisely how much he had placed with BCCI. That amount was reflected on the account statements Khalil received from BCCI, which he closely monitored. Although on certain occasions, Khalil complained that the amount he had deposited, or the amount of interest credited to his account, was not accurately reflected, the statements were adjusted at or near the time Khalil made such complaints.

When Khalil withdrew his deposits from BCCI, he presented his account statements to Naqvi. Naqvi suspected that the account statements, which had been prepared at Akbar's direction, *overstated* the amount Khalil had with the bank, but Naqvi was in no position to argue with Khalil. See Naqvi Dep., Mar. 27, 1998, at 74–76; Tr. (Akbar) at 456–58. Instead, Naqvi directed that Khalil receive the amount reflected on the account statements Khalil had presented to Naqvi. There was no unaccounted-for surplus. *See also* Tr. (Akbar) at 470.

Realizing the Court may find that many of the BCCI documents bear sufficient indicia of reliability to be both admissible and entitled to evidentiary weight—as has been done here—Khalil's fall back defense was that even if the Liquidators' numbers were accurate, those figures do not account for the fund Khalil placed "in the hand" of Akbar, which, according to Khalil's counsel, was a sizable fund kept outside BCCI.

Khalil's testimony was quite inconsistent on this critical point. On a few occasions, Khalil presented testimony suggesting that the money in Akbar's hand was kept outside BCCI. For example, when asked about a document he penned:

Q: .... Does that refresh your recollection, sir, that in fact you had current accounts at BCCI?

A: Just a moment. I don't have current account.[17] I have money with Mr.

---

**17.** *But see* Khalil Dep. (*FAC*) at 26 ("The difference in the money, I don't remember how much at that time to my account, my current account, no problem.").

Akbar. And this is now he's not putting—because he's not putting the money in the BCCI. He's putting the money outside the BCCI....

Khalil Dep. (*BCCI*) at 212; *see also id.* at 214 ("[T]his is my money with Mr. Akbar putting in another bank.").

However, on closer inspection, this issue was a red herring. Most portions of Khalil's testimony demonstrate that he knew the money "in Akbar's hand" was kept in BCCI current accounts.[18] For example:

Q: .... Now, the first time that you put money in the bank somebody came to your home, collected suitcases and put all that money in deposit accounts at BCCI?

A: .... They do like this. They put little deposit. They pay for the shares of the BCCI. They open account from the money in the hand of Mr. Akbar, okay. Because he needs to pay the expenses.

Khalil Dep. (*BCCI*) at 52.

\* \* \* \* \* \*

Q: What did [Akbar] do with that money?

A: Which money?

Q: The money that he came and took?

A: He took it to the bank. He took it and he divide it, some in the deposit, some in his hand.

*Id.* at 54.[19]

Not only did Khalil testify that all of his money was deposited in BCCI, but he also

did not introduce any records of his own, or from any bank other than BCCI, showing that the money "in the hand" of Akbar was kept outside BCCI. It also is highly improbable that Khalil would have entrusted Akbar with funds to be kept somewhere other than BCCI when Khalil was hardly acquainted with Akbar at the time he made his first deposit with BCCI. On the contrary, Khalil understood that BCCI was his agent and that Akbar worked for BCCI, at least as to funds in his deposit and current accounts. *See* Khalil Dep. (*BCCI*) at 80.

On balance, the Court finds that Khalil's references to money "in the hand" of Akbar refer to funds kept in current accounts at BCCI. The memorandum accounts kept by Akbar at BCCI accurately tracked Khalil's actual deposits with BCCI. There was no fund kept outside BCCI.

### III. KHALIL'S NOMINEE OWNERSHIP OF BCCI SHARES

The Court also cannot credit Khalil's testimony that he actually paid for any of the BCCI shares registered in his name. BCCI shares were not publicly traded, they were sold through private placements on an invitation-only basis. In the late 1970s, Abedi sought new shareholders in BCCI to finance the bank's expansion. Abedi approached his friend Adham to help recruit investors. Adham presented the "investment" opportunity to Khalil, who agreed in principle to invest.

---

**18.** Most of Khalil's testimony concerning the funds in Akbar's hand sought to differentiate those funds from the funds in the deposit accounts. According to Khalil, the funds in the deposit accounts were pooled funds belonging to him and his partners, and it was important that Akbar not "break the deposit" (i.e. pay a penalty for early withdrawal) when paying Khalil's expenses. According to Khalil, the money in Akbar's hand belonged to Khalil alone, and was to be kept liquid so that Khalil could call upon it at a moment's notice.

**19.** *See also id.* at 41 ("The only money have in whole world in two places, my house and BCCI."); *id.* at 410 ("Oh yeah, I don't have

money except with BCCI."); *id.* at 593 ("[W]hen [Akbar] start at the beginning, when he took the money, he opened I think a—from my money in one of the branches for expenses ...."); *see also id.* at 170 (acknowledging that a $915,000 debit to one of his genuine current accounts with BCCI reflected a jewelry purchase taken from money in Akbar's hand); *id.* at 590 ("I have all something nearly again 50 million Saudi riyals, far away from any deposit account, from we call it current account, it means pay 2 million today, until tomorrow, put 3 million, 5 million, just like that, because I don't like to break the deposit account.").

Abedi sought genuine capital infusions, but he also needed some investors to act as nominee purchasers of BCCI shares. Abedi wanted to give the appearance of new capital being placed with BCCI without diluting his control. Abedi envisioned that ultimately only a large institutional investor would be able to provide for BCCI's continued viability. Naqvi explained the "special arrangements" that BCCI offered to prospective shareholders such as Khalil until such time as an institutional investor could be found:

> Mr. Abedi wanted to make sure that a significant percentage of the shares is held by such holders who would be willing to sell those shares or transfer those shares to this new structure, whenever it takes place.

> So he wanted to have special arrangements with some of the shareholders to ensure that a good sized block of shares remain available to him for the purpose of this restructuring. And in one of those reviews, Mr. Abedi asked me [Naqvi] that if we will find out from Mr. Raouf Khalil whether he will hold part of his—part of the shares in his name under an arrangement which is like this nominee arrangement you have described.

Naqvi Dep. at 19. Naqvi deputized Akbar to discuss the nominee proposal with Khalil. Khalil knowingly agreed to serve, and did serve, as a nominee in conspiracy with senior officers of BCCI to act as a registered shareholder of BCCI Holdings.

The Court finds that when Khalil first deposited money with BCCI, Khalil had an understanding with Adham that some of his funds would be used to purchase BCCI Holdings shares. However, the Court infers from the evidence that shortly thereafter, Akbar approached Khalil with the nominee proposal. Khalil, Akbar, and Abedi reached an agreement by which

BCCI would advance Khalil loans on a non-recourse basis to finance the purchase of those BCCI Holdings shares that Khalil was to own beneficially and, in addition, Khalil would allow BCCI to "purchase" additional shares in his name in which he would have no beneficial interest. This agreement was entered into before any of Khalil's genuine accounts had been debited for the purchase of BCCI Holdings shares. At no time were Khalil's funds used for the purchase of the BCCI Holdings shares owned beneficially by Khalil.

Although shares were accounted for in BCCI's books as either "beneficially" owned by Khalil or nominee shares, BCCI funded all of the share purchases in Khalil's name and Khalil had no commercial risk with respect to any of the shares. Naqvi subsequently learned of this new financing arrangement and accepted it as consistent with his and Abedi's overall agreement with Khalil. At no time did Khalil repay the loans taken in his name to pay for his beneficial BCCI Holdings shares.

Khalil became a record shareholder of BCCI Holdings in 1979. Senior management made its first designated nominee purchase of BCCI Holdings shares in Khalil's name in June 1980. Thereafter, periodically during the 1980s, BCCI management purchased additional shares in Khalil's name. Imam recorded some of these as "beneficial" shares and others as nominee shares. In or around May 1985, Khalil and Akbar each signed a schedule which listed the "beneficial" and nominee purchases, and the loans taken out against each portion. *See* Naqvi Dep. 27–33 & Pls.' Ex. 1489; Tr. (Giles) at 62–64; Pls.' Ex. 1489A.

Shares were purchased in the name of Khalil on the following occasions in the following amounts:

| Date | # of Shares | Share Price | Principal Cost |
|------|-------------|-------------|----------------|
| Oct. 1, 1979 | 20,000.0 | $125.00 | $ 2,500,000 |
| Dec. 21, 1979 | 4,000.0 | $125.00 | $ 500,000 |

| | | | |
|---|---|---|---|
| June 27, 1980 | 40,000.0 | $125.00 | $ 5,000,000 |
| Dec. 29, 1980 | 10,315.8 | $125.00 | $ 1,289,475 |
| Dec. 31, 1981 | 10,526.3 | $200.00 | $ 2,105,260 |
| Dec. 31, 1981 | 6,666.6 | $200.00 | $ 1,333,320 |
| Dec. 29, 1982 | 21,054.0 | $ 40.00 | $ 842,160 |
| Dec. 29, 1982 | 13,334.0 | $ 40.00 | $ 533,360 |
| Dec. 27, 1984 | 34,386.0 | $ 40.00 | $ 1,375,440 |
| Dec. 27, 1985 | 51,579.0 | $ 40.00 | $ 2,063,160 |
| April 14, 1989 | 57,748.0 | $ 40.00 | $ 2,309,920 |

**TOTAL** $19,852.095

To make these purchases appear real, senior management of BCCI created loans from BCCI Group companies for both the "beneficial" and nominee share purchases. The accounting for these share purchases as loans was false. These were paper transactions, backed by transfers of funds from one part of the BCCI Group to another. To effect the share purchases, funds were transferred by wire from accounts in the Cayman Islands to accounts in the United States, and were then transferred to accounts in Luxembourg. The Court credits Gilkes' testimony demonstrating that these transfers were accomplished using wire transfer facilities in the United States. In addition, instructions related to the transfers were sent by wire and United States mail.

Khalil incurred no genuine, collectible debt in relation to the "loans" used to finance his share purchases, and BCCI obtained no genuine, collectible right to payment on the "loans" created to finance these share purchases. With respect to the nominee shares, Khalil had no obligation to repay the loans. With respect to the beneficial shares, BCCI could not collect on the loans financing those shares, but Khalil agreed that the profit he would take from the proceeds of any sale of such shares would be only the difference between the share price and the loan amounts as to those beneficial shares. However, if at the time of sale the share price was less than the outstanding loan

amount, Khalil would not be obliged to repay the difference.

Khalil signed documents which gave all rights over both the "beneficial" and nominee shares to ICIC, and which applied the proceeds of any sale to pay off the outstanding loans. Khalil also signed transfer deeds in blank.

The effect of Khalil's service as a nominee was to inflate falsely the share capital of BCCI. By agreeing to act as a nominee, Khalil understood that he was enabling BCCI to misrepresent to regulators, auditors and prospective depositors that BCCI Holdings had support through the investment of share capital by a wealthy investor when in fact that investment had not been made and the share capital, which supported the banking activity of the group, was in fact fictitious. BCCI records gave the appearance that Khalil had borrowed $19,852,095 from BCCI to purchase his BCCI Holdings shares.

## IV. TRANSACTIONS DONE IN KHALIL'S NAME

Shortly after Khalil agreed to hold BCCI Holdings shares as a nominee, his agreement with BCCI management expanded. Abedi still sought new sources of capital to fund the bank's expansion. One potential source of income was to increase the bank's trading operations. New financial instruments, certain kinds of futures and options, had been introduced into the London markets. Akbar, as a senior officer in BCCI's Treasury operations had become the bank's lead trader. From the evidence, the Court infers that Akbar had

met with early success in the markets, and he was eager to manage a larger pool of funds for trading purposes. He also was eager to share in some of the returns he was providing to the bank.

Akbar proposed that BCCI management approach certain customers. As Naqvi testified, "the basic arrangement was that ... the customers may be asked to permit the bank to trade in their name, the bank will provide all the funds, and the bank will take all the risks." Naqvi Dep. at 36. With Naqvi and Abedi's authorization, Akbar approached Khalil to discuss this proposal.

The Court finds that Akbar did approach Khalil, but with two proposals. The first was the nominee arrangement outlined in Naqvi's testimony. The second proposal was Akbar's own. He proposed that he and Khalil form a partnership to invest the funds in Khalil's current accounts, the funds put in his hand, in commodities, futures, and options. With great assurance, Akbar promised Khalil returns ranging from double to triple the interest that he could earn from BCCI. Khalil was interested in both arrangements, but he did not want to assume any of the risk.

### A. The Khalil–Akbar Partnership

As to the Akbar–Khalil partnership, each agreed that Akbar could trade with Khalil's funds, profits would be split evenly between the two of them, and Khalil's capital would be guaranteed. Khalil was attracted to Akbar's entrepreneurial energy but recognized the risks of allowing him too free a rein. Shortly after he had agreed to both the Treasury nominee arrangement and the Khalil–Akbar partnership, Khalil consulted with Abedi and Naqvi concerning Akbar's trustworthiness. They told Khalil to trust Akbar "more than the bank." And, as it turned out, he did. The Khalil–Akbar partnership became incorporated as Capcom UK in 1984.

As will be seen, Akbar, with Khalil's knowledge and agreement, siphoned virtually all the start-up capital from BCCI, and Akbar managed Capcom UK's affairs from behind the scenes until 1987.

Akbar did not fully disclose the terms of the Khalil–Akbar partnership to Naqvi and Abedi.[20] Akbar was a schemer on par with Abedi himself. Akbar sensed that down the line Khalil could be a willing patron to finance Akbar's grander schemes. To disguise the extent of the profits he had earned with Khalil's funds, Akbar told Naqvi that Khalil was demanding an increase in his fee for acting as a nominee for the Treasury trading. Naqvi agreed that Akbar should pay Khalil off. *See* Naqvi Dep. at 55.

The Liquidators sought to show that a total of $1,261,968, divided into three payments, was deposited in Khalil's accounts in 1980 and 1981 as a pay-off. However, Gilkes was only able to document that two of the three payments were made, and he referred to no documents showing that these funds had come from BCCI assets. In the absence of such evidence, the Court finds that the $1.2 million Khalil received actually came from trading profits. *See* Tr. (Akbar) at 496–97.

### B. The Treasury Nominee Scheme

As to the BCCI Treasury proposal, Khalil agreed to, and did, serve as a nominee for transactions undertaken by the BCCI Treasury Division. Naqvi and Abedi guaranteed that Khalil's deposits would not be at risk. Khalil and Akbar agreed that as to BCCI Treasury trading done in the name of Khalil or Khalil-owned companies, Khalil would receive approximately one percent of the total amount invested in his name as a nominee fee. Naqvi and Abedi later ratified this agreement.

---

**20.** When Khalil mentioned the "partnership" to Naqvi, Naqvi understood it to refer only to the nominee arrangement for BCCI Treasury, but Khalil's remark covered both agreements. *See* Naqvi Dep. at 37, 39.

## C. Khalil–Owned Companies and Unreimbursed Expense Outlays

A number of the fraudulent transactions undertaken by Treasury were done either in Khalil's name or in the name of a company owned by him. Capcom UK was the formal incorporation of the Khalil–Akbar partnership. Additional companies, wholly owned by Khalil, came into being as a tax vehicle for Khalil to purchase real property. For example, not long after Khalil began his banking relationship with BCCI, he decided to purchase a home in London known as Moncorvo Close. As part of what Khalil termed the "VIP service" offered to important customers of the bank, BCCI assisted Khalil in the purchase by providing a lawyer to handle the closing and an inspection company to inspect the premises.

In addition, Akbar arranged transportation to and from the airport, made hotel reservations for Khalil and his family, and paid Khalil's staff and utility bills for the new residence. At Khalil's direction, Akbar had furnished and decorated Moncorvo Close so that the house would be inhabitable when Khalil and his family arrived.[21]

There is no dispute that Khalil authorized Akbar to set up an offshore company, Maram Trading Company ("Maram"), to hold title to Moncorvo Close for tax purposes. Maram was a Cayman Islands corporation owned by Khalil and named for his daughter.

Khalil subsequently purchased three other homes in the same manner. Another company, Khalil Investment and Trading Company, a Panamanian corporation, was incorporated by Akbar at the request of Khalil. Of the three additional homes, Sunningdale in Berkshire, England and Lakeside Village in Rockwall, Texas, were purchased in the name of Khalil Investment and Trading Co. (*Id.* at 46, 69, 71, 292, 295). Seadunes, a home in New Smyrna Beach, Florida, was purchased in the name of Maram Trading Company. Khalil also acquired an interest in a property called Potato Patch in Vail, Colorado. For that acquisition he used a company, owned by him, called KINTRA Universal Company, Limited.

As to his first acquisition, Moncorvo Close, Khalil paid the bulk of the actual purchase price from his own funds. However, as part of the "VIP service" for acting as a nominee, BCCI paid a small portion of the purchase price and the ancillary expenses. As Khalil's leverage over the bank increased, BCCI came to pay nearly all costs related to the subsequent transactions. *See generally* Tr. (Gilkes) at 214–28 & exhibits referenced therein. In all, BCCI advanced $2,249,352 of its own funds in connection with these property transactions as payment to Khalil for his services as a nominee. Khalil did not repay this sum because he had no obligation to repay.

Building on these real estate transactions in which Khalil had a beneficial interest, BCCI Treasury also used companies nominally owned by Khalil to purchase properties from BCCI at inflated prices. For example, in 1981, BCCI sold a Hong Kong property it had acquired on December 15th for $1,833,890 to a company nominally owned by Khalil for $3,962,580. The resulting $2.1 million was recorded as a profit in BCCI's 1981 year-end books. These transactions were accomplished through the use of international and United States wire facilities.

## D. Commodities Trading

As is the case with most gamblers, Akbar's lucky streak in the markets ran out. In 1983, at Akbar's direction, BCCI's Treasury division acquired significant posi-

---

21. Akbar, not familiar with Khalil's affinity for things of exquisite beauty and expense, spent very modest sums on the furnishings. Upon arrival, Khalil was aghast, but he said nothing to Akbar. Within the next few days, after a trip to Harrods and elsewhere, Khalil redecorated. The record is not clear as to whether the costs of redecorating were reflected on the credit card bills paid for by BCCI.

tions in silver and copper on the belief that prices of the metals would continue to rise. In fact, prices dropped, and BCCI was forced to take delivery of significant amounts of metal at above-market prices. Under normal business practices, if BCCI had been holding this metal at the end of the year, or had sold it at market price during the year, it would have recorded tremendous losses. Doing so would have shaken the confidence of the bank's real investors and almost certainly would have invited increased regulatory scrutiny that would have led to the bank's closure.

Rather than record these losses, BCCI transferred the silver at above-market prices to two entities, Euro Commodities Limited and Notan Trading, which were controlled by Akbar and wholly-funded from BCCI's Khalil-related nominee accounts. Although all of the funds for these "purchases" came from internal BCCI sources, the transactions were recorded as sales. Consequently, at the close of 1983, BCCI's books showed a much smaller loss than the bank had actually suffered.

### E. Circular Transactions

In addition, Gilkes testified as to how the BCCI Treasury division carried out a number of other fraudulent transactions done in the name of Khalil, or one of his companies. One type of transaction was a circular routing transaction done to disguise the fact that BCCI was servicing many of its own loans, giving the appearance that non-performing loans were viable assets. As an example:

(1) On June 26, 1985, BCCI created two loans on its books and transferred a total of $82 million to Capcom UK's subsidiary, Brenchase, by means of two U.S. dollar checks;

(2) that same day Brenchase placed the money with its parent company Capcom UK;

(3) the next day, June 27, the $82 million plus interest was returned by Capcom UK to Brenchase;

(4) Brenchase then divided the money into two parts: $42 million was sent back to Capcom UK by U.S. dollar check, which then paid the money to BCCI, thus giving the appearance that non-BCCI funds were coming into the bank;

(5) the $40 million which remained at Brenchase was then transferred by international and United States wire to BCCI;

(6) the $42 million sent from Capcom UK to BCCI was used to service an account at BCCI that had been previously used to forward money to Capcom UK that was never repaid;

(7) the $40 million that was transferred from Brenchase to BCCI was used to create that false impression that substantial commercial loans were performing when they were not.

*See* Tr. (Gilkes) at 286–88; Pls.' Exs. 1514–22, 2409–11, 2429–30, 2436–39, 2444–45 BCCI engaged in similar circular routing transactions with the Bank of India and the State Bank of India. Each such transaction had the effect of hiding non-performing assets and creating false profits on the books of BCCI. *See* Tr. (Gilkes) at 289–96; Pls.' Exs. 17–18.

### F. Akbar's Authority

A great deal of testimony was devoted to whether Khalil had authorized Akbar to undertake any of these activities, and if so, the extent of that authority. Khalil maintained that he gave Akbar only a formal power of attorney in relation to the creation of companies for the purpose of purchasing real property for Khalil's own use and to finalize such purchases. Akbar certainly had apparent authority to transact a far wider range of business in the name of Khalil and Khalil-owned companies, both with BCCI's funds and with Khalil's funds. It may well be that some of the "power of attorney" forms bearing Khalil's name that were introduced into evidence were in fact signed by Akbar. This does not lead to

On the contrary, the Court finds that in or about 1980 Khalil authorized Akbar, in both his capacity as a BCCI employee and as Khalil's partner, to undertake a broad range of activities in Khalil's name, and in the name of Khalil-owned companies, *see, e.g.,* Jawhary Dep. (*FAC*) at 914–15. This authority included, but was not limited to, creating BCCI accounts in Khalil's name and the name of his companies in which Khalil had no beneficial interest or obligation, and using such accounts to engage in fraudulent wire and mail transfers, to purchase and sell real property, and to trade in commodities, futures, and options. Akbar was further authorized to sign such documents in Khalil's name as Akbar deemed necessary to carry out these activities.

Akbar kept Khalil apprised of the progress of the overall scheme. Contrary to Khalil's testimony that he could never find Akbar when he needed him, the Court finds that Akbar consulted with Khalil by telephone on a frequent basis. *See* Deposition of Lorna Wisdom at 20–21. However, unlike with his deposits, in which Khalil's own funds were at issue, Khalil willfully and deliberately kept himself ignorant of the details as to how Akbar exercised that authority. *E.g.,* Khalil Dep. (*FAC*) at 5–6, 102–03, 119; Tr. (Akbar) at 462, 489–90, 496. His capital had been guaranteed, and he knew that he would be held harmless if any of the transactions turned out to be to BCCI's detriment. The scale of these transactions increased steadily. *E.g.,* Tr. (Akbar) at 477. Over time, Khalil was paid millions of dollars pursuant to this agreement.

## V. First American Share Nominee Arrangements

Khalil also was instrumental in facilitating another aspect of Abedi's grand design. Abedi badly wanted BCCI to provide banking services in the United States. He wanted to tap into the profitability of the United States market, and he believed

entry into the United States would allow him to ultimately regularize and legitimize BCCI's operations worldwide. Abedi expected that some day he would allow the bank to come under a respected regulatory authority. He hoped that BCCI could acquire a controlling interest in an American bank and then come to an arrangement with the Federal Reserve.

However, in the late 1970s and early 1980s, Abedi believed that BCCI was not in a position to seek and obtain Federal Reserve approval to purchase a significant interest in an American bank. Consequently, Abedi and Naqvi concocted a nominee scheme to take over what was later named First American Corporation, a regional bank holding company that controlled what was once the largest bank in the Washington, D.C. area. Under the nominee scheme, wealthy individuals from the Middle East would purport to own the shares of CCAH, the shell corporation that became First American's parent. Some of these investors, such as Adham, would beneficially own some shares—often through loans supplied by BCCI—and also own additional shares as a nominee for BCCI.

Sometime in late 1980 or early 1981, Abedi again asked Adham to help recruit investors. Adham again approached Khalil. As part of his agreement to serve as a nominee for BCCI for a variety of purposes, Khalil also agreed to serve as a nominee in the acquisition and maintenance of control of the shares of CCAH. Khalil was one of several nominees who participated in the scheme.

To carry out the scheme, BCCI created CCAH, which wholly owned CCAI, also a shell. CCAI came to own First American Corporation, which, in turn owned First American Bank, which owned the retail banks with whom many residents and businesses in the Washington, D.C. metropolitan area did their banking. Ownership of CCAH meant ownership of First American.

In order for CCAH to gain ownership of First American, approval of the Federal Reserve Board was necessary. In April 1981, some of the proposed owners, including Khalil, flew to Washington, D.C. to testify before the Board. Prior to testifying, Khalil had done no due diligence concerning his "investment." The parties agree that Khalil knew very little about First American when he appeared at the Federal Reserve hearing.

Khalil's own testimony as to the circumstances of his acquisition of First American shares confirms his nominee status. Financial information on Khalil had previously been supplied to United States regulators through BCCI, although Khalil asserts that he did not know financial information was filed on his behalf. Khalil testified in this case that he knew virtually nothing about the bank he was purporting to acquire an interest in when he appeared in Washington in 1981. He did not know what percentage of the bank he was acquiring or precisely how much he was supposed to be investing. *See* Khalil Dep. (*BCCI*) at 379–84, 400, 407, 417. Khalil asserts that he gave Abedi discretion, within a specified range, to decide how much would be invested on his behalf and what percentage would be acquired.

Khalil understood that the CCAH shares BCCI was purchasing in his name were being counted on to form the majority interest in First American, although Khalil testified that he heard it from Adham instead of a BCCI officer. Khalil did not negotiate or discuss a voting trust or some other form of shared control by which "his" shares would be used to consolidate control. Moreover, Khalil knew that this transfer of control required regulatory approval, which is why he flew to Washington.

Khalil flew to Washington with Akbar. On the eve of his Federal Reserve testimony, Khalil met with Clark Clifford and Robert Altman, partners in the law firm of Clifford & Warnke. From the record in this case, it is unclear whom Clifford and Altman represented in their dealings with Khalil. Khalil testified that when he arrived at Clifford & Warnke's offices, he waited while Adham met with Clifford and Altman. Then, Khalil was given a prepared statement to read to the Federal Reserve. Khalil was asked to rehearse the statement with Clifford, who coached Khalil on his delivery. Khalil read the statement and did not claim that it was inaccurate in any way. Khalil delivered the statement, as prepared, to the Federal Reserve.[22]

On the basis of the testimony of Khalil and the other nominees, along with documentation supplied by BCCI, the Federal Reserve approved the sale of First American. The Federal Reserve was unaware that BCCI would be the beneficial owner of a controlling interest in First American.

**22.** Khalil's telling of these events is more colorful:

> Q: So you get to Washington, and what happens next?
> A: .... When [Adham] finished the meeting he said look, this is—he was minister I think of defense. Now he's the man, he has a lawyer office like this, he's the man who will be responsible for the buyer because regulation, *as he said, work like this.*
> Q: He was talking about Mr. Clifford?
> A: Clifford.
> Q: He had been meeting with Mr. Clifford?
> A: Yeah, too, and Altman inside. After he said this is Altman, that is the son of Mr. Clifford, like that. First word after how do

> you do everything, how is your English language? I said it's not perfect. That means that somebody told him and he knows me, I am not Shakespeare, but I'm trying to explain whatever I know ..... He said no, we prepared everything for you. Just I would like to read in front of you and Jawhary, please repeat it again tomorrow. And ... he read, when you have point, stop like. He want me to do it with very prestigious way. I cannot. This is not my way.....
> ....
> Q: Who rehearsed you through this, through your lines, was that Mr.—
> A: Mr. Clifford.

Khalil Dep. (*BCCI*) at 385–87.

Had the Federal Reserve known that BCCI was behind the takeover of First American, transfer of control would not have been approved.

The initial transfer of CCAH shares took place in 1982. Khalil tells an improbable tale to explain how he actually purchased his shares. According to Khalil, he authorized Abedi to buy between $5 million and $8 million of CCAH stock. Khalil testified that after the initial purchase, he received a statement from BCCI showing that $14,832,000 had been taken from his accounts to purchase between 4 and 5 percent of CCAH. Khalil testified that he was angry that Abedi had greatly exceeded the authorized amount. However, Khalil did not introduce this bank statement into evidence, nor did any witness who spoke with Khalil at the time testify that Khalil was upset. On the contrary, on the return flight from Washington in April 1981, Khalil acknowledged his nominee status to Akbar. At later times Khalil again acknowledged his nominee status with respect to CCAH shares in his name to both Akbar and Naqvi.

The documentary record also demonstrates that Khalil was a nominee for BCCI. Three blocks of shares were purchased in Khalil's name. There was an initial purchase of 8,240 shares in the tender offer of March 1982, and rights shares purchases of 1,667 shares in August 1982 and 3,343 shares in November 1983, amounting to a total purchase of 13,250 shares registered in Khalil's name. None of the memorandum account statements kept by Akbar that were introduced, nor any of the account statements produced by Khalil, show that any of his deposit or current accounts were debited to pay for any of these purchases. Rather, the documents show that BCCI created false loans from BCCI Group entities to carry out the nominee purchases. The nominees, including Khalil, had no obligation to repay the loans; BCCI's investment was concealed

through the nominee lending. The total amount of BCCI's direct investment in the shares of First American through the nominee scheme was $556,108,245.

For the initial purchase, BCCI routed funds for the shares purchased in Khalil's name through the Swiss bank account of another nominee shareholder, Sayed Jawhary. BCCI created a false $30 million loan to Khalil in BCCI Overseas, Grand Cayman. Those funds were then sent to a false current account in Khalil's name at BCCI, S.A., London. Most of these funds were subsequently transferred by wire from BCCI to United Overseas Bank, Geneva, to the credit of Adham's and Jawhary's actual accounts. The funds sent to United Overseas Bank were then returned by wire to BCCI where they were pooled with funds for other nominees as well as beneficial shareholders and transferred to the ICIC Call Deposit Account, which was the collection account for the First American tender offer at BCCI Overseas. These funds were then remitted by wire to BCCI Overseas' account at Bank of New York and then to First American's account at Chase Manhattan. There was no commercial purpose for such a roundabout routing of funds, which concealed from the auditors and regulators the fact that the BCCI Group had supplied the funds for the purchase of shares in Khalil's and others' names.[23]

Khalil knew that the funds for purchase of the shares in his name had been routed through the Swiss account. Jawhary testified that he told Khalil that Jawhary's Swiss account had been used to route funds and that "Khalil said fine." Jawhary Dep. (*BCCI*) at 12–13.

BCCI management carried out the second and third nominee purchases in Khalil's name in similar fashion. The second purchase of shares in the name of Khalil occurred in August 1982. A loan of $12,060,000 was drawn down in the name of

---

23. As is evident, this routing transaction to conceal the source of funds to purchase Khalil's shares was effected through the use of international and United States wires.

another nominee at BCCI Overseas, Grand Cayman. The funds were transferred from BCCI Overseas by wire to First American's account at Chase Manhattan Bank in New York in August 1982. The transfer included $3,000,600 for shares in the name of Khalil and $9,059,400 for other nominees. Again, United States and international wires were used to effect the transaction. The third purchase of shares in Khalil's name occurred in November 1983. A loan of $6,368,415 was drawn down in the name of Khalil at ICIC Overseas, Grand Cayman, which was aggregated with other loans drawn down at ICIC in the name of other nominees and remitted by wire to First American's account at State Bank of Albany in New York.

In total, $24,201,015 was paid by the BCCI Group to finance nominee shares for Khalil. These transactions were all recorded in BCCI's books as loans. BCCI documented its ownership interest in First American in detail. With immaculate penmanship, Imam tracked on a regular basis BCCI's internal carrying costs on these nominee loans.[24] The accounting for these nominee purchases as loans was false; the financing did not represent genuine and collectible loans made to Khalil, and the purported loans were never repaid by Khalil.

In support of his claim that he was the beneficial owner of his CCAH shares, Khalil testified concerning a 1984 trip he made to Washington, D.C. area, where Khalil's son, Khalid, lived. Khalil entered a First American branch in Falls Church, Virginia and attempted to cash $100,000 in travelers checks. The teller explained that he only had permission to cash up to $3,000, and that authorization from a su-

pervisor would be required. Khalil stated that he was a shareholder of the bank. The branch manager telephoned Altman, who authorized the transaction. *See* Khalil Dep. (*BCCI*) at 352. Within the same week, Khalil visited Altman in his office to hear a report on First American's progress. Khalil testified that during the meeting Altman showed him his CCAH share certificates but told Khalil that the certificates could not be delivered to him for another 18 months.

The evidence does not support this version of events. The Court finds that Khalil did travel to Washington, D.C. in 1984, and that he did meet with Altman. Although Khalil was a nominee owner of First American, he expected First American to extend to him the same "VIP service" he received from BCCI. Khalil sought information concerning First American's success so that he could value his service to BCCI as a nominee. Altman did not have the CCAH share certificates; Imam did. *See* Imam Dep. at 74–75; *cf.* Khalil Dep. (*BCCI*) at 835 (testifying in regard to Capcom share certificates that "if you have the real shares why you give it to other people.").

It was illegal for the BCCI Group to acquire or maintain its beneficial interest in First American without approval by the Federal Reserve. By participating in the nominee scheme, through which BCCI acquired a controlling interest in violation of United States banking laws, Khalil and his co-conspirators subjected BCCI to criminal liability and substantial financial loss.

## VI. TERM DEPOSITS

Khalil closely watched BCCI's treatment of his term deposits. He had instructed

24. At Naqvi's direction, Imam kept detailed records of CCAH shareholding. Almost all the CCAH shares were purchased with loans from BCCI. Some of these loans were false and were created to disguise BCCI's direct equity investment in First American. Other of these loans were, at least in some respects, real extensions of credit. To distinguish between the two, Imam listed the nominee shareholders as "Group I." This group was not obliged to repay the "loans" advanced for the purchase of their shares. *See* Imam Dep. at 42. By contrast, Group II shareholders were expected to repay their loans. *Id.* at 48–49. Some CCAH shareholders, such as Adham, were listed in both Groups I and II because they held some shares as nominees and other shares beneficially. At all relevant times, Khalil was a Group I shareholder; a nominee.

BCCI to roll over his term deposits and to find him the best interest rates available. He expected BCCI to provide him with above-market rates. *E.g.*, Khalil Dep. (*BCCI*) at 137, 209–10. Early on he detected problems with his account statements. He found that the interest payments were not as great as expected or not at the agreed-upon rate. In his terms, BCCI staff was "playing with the interest" or doing "monkey business."[25] Although Khalil appears to have been aware of all such discrepancies, he chose to point out only the more egregious to Akbar, who grudgingly had them corrected. *E.g.*, Khalil Dep. (*BCCI*) at 90–91, 197–98. He purported to cancel his previous instructions to Akbar, but in fact, his relations with the bank remained unchanged.

The Court finds this conduct to be further corroboration of Khalil's nominee status. Khalil understood that the BCCI Group needed him more than he needed them, and that by acting as nominee, Khalil had additional leverage over the bank. As a result he expected to receive above-market interest on his genuine deposits, and he expected to receive additional payments and profits for his service as a nominee. Had Khalil been only a genuine depositor, he certainly would have withdrawn his money from BCCI rather than tolerate regular discrepancies in his account statements. However, the fact that Akbar and others tried to cheat on their agreement by providing less interest than had been agreed troubled Khalil, but did not cause him to leave the bank. The potential payoffs of staying outweighed the annoyance of having to monitor Akbar and bring him back into line from time to time.

## VII. GROWTH OF CAPCOM

In the mid–1980s, a number of events transpired that changed Khalil's relationship with BCCI. These began in 1984 and were triggered by Akbar's deteriorating relations with Abedi and Naqvi. Akbar consulted with Naqvi on a daily basis, but Naqvi began to lose trust in Akbar. Naqvi's suspicions were well founded.

The newest development was the founding of Capcom UK (initially named Hourcharm Ltd.) in April 1984. When Khalil and Akbar agreed to start Capcom UK, they agreed to siphon funds from the BCCI Group to capitalize and support the new venture. Khalil testified that he and Akbar, as partners, controlled 67 percent of Capcom UK shares, though that was not reflected in the records of Capcom. Akbar did not become a registered shareholder of Capcom until 1987, but he nevertheless created and controlled the operations of Capcom UK from "behind the curtains." Khalil was a director of Capcom UK and consulted regularly with Akbar concerning the company.

In furtherance of this conspiracy, Akbar—as head of treasury for the BCCI Group—created loans in the books of BCCI in the name of Khalil and Khalil-related companies, including Maram Trading Company. These funds were transferred from BCCI accounts (at times using U.S. bank accounts and using international and United States wire facilities) to Capcom UK as capital and as trading funds. These funds were converted to the use of Capcom UK and were not repaid to the BCCI Group.

Capcom began trading in September 1984. To the surprise of many in the

---

**25.** According to Khalil, this was a reflection of national character.

> Q: I'm sorry, you were talking about BCCI being run by Pakistanis?
> A: Yes. They type of the people that are dealing millions and millions, they're not from rich country, they're from poor country and they are from poor very inside the country. When you put all this liquidity in their hand I think he's not an angel coming

> from the sky, he's a person. He need to play. I am not concerned about BCCI and the people, no, all we face that in Saudi Arabia. In our banks, in our companies, you see, in our relation with any contract building like this, always like that, always.
> Q: Always what?
> A: Always they cheat, they play.

Khalil Dep. (*BCCI*) at 215; *see also id.* at 478–79.

London trading community, it appeared as if Capcom had become a large presence in the market almost overnight. At Akbar's direction, BCCI used Capcom extensively as a broker. In addition, between October 1984 and December 1984 Akbar caused BCCI to transfer a total of $100 million to Capcom UK. Neither Naqvi nor Abedi authorized these transfers. These funds were initially debited to an overdraft account in the name of Khalil at BCCI Overseas, Grand Cayman. The debits to this account falsely represented that Khalil was liable to repay the amounts advanced. In fact, he was held harmless as to any debits to the account and the accounting for the transfers therefore falsified the books and records of the BCCI Group. The funds were transferred to Capcom by BCCI Overseas using international and United States wire facilities and United States bank accounts. In addition, the transfers were confirmed using international and United States wire facilities and the United States mail. The liability for these transfers was subsequently transferred from the Khalil overdraft account to a loan account in the name of a Khalil-owned company, Maram Trading Company.

Flush with cash, Capcom UK expanded into the growing commodities futures market at the Chicago Board of Trade by incorporating Capcom U.S. in May 1985. Capcom UK was the record shareholder of 82 percent of Capcom U.S. stock. One month later, Akbar caused BCCI to transfer approximately $25 million to Capcom UK, debiting an account in the name of Maram Trading Company. These funds were transferred to Capcom UK by wire using United States bank accounts and international and United States wire facilities. Akbar disguised the true nature of this transfer by making it appear as if Paten Holding Company—a Panamanian shell company that Akbar had set up through a Swiss lawyer—had advanced the funds as non-recourse loans to the shareholders of Capcom UK. Khalil executed a loan agreement and memorandum of deposit purportedly evidencing a loan from Paten Holding to him secured by shares in Capcom UK. Jawhary and Adham also executed loan agreements in favor of Paten Holding. When received, the funds were accounted for by Capcom UK as share capital.

## VIII. THE $12.5 MILLION PAYMENT TO KHALIL

Around this same period, mid–1985, while Akbar was literally looting the BCCI treasury, Naqvi first became aware of sizable losses Akbar had been incurring in the Treasury operations. Akbar warned Khalil that Akbar's position with the bank had become shaky. Whatever allegiances Akbar may have had for BCCI were quickly evaporating, and Akbar placed a higher premium on his lucrative partnership with Khalil. Khalil understood that many of BCCI's Treasury losses had occurred in connection with accounts in his name. BCCI was scrambling to find a way to disguise these losses from its external auditors. This gave Khalil additional leverage over the bank. At the same time, Khalil had become nervous about the safety of his deposits. Akbar had revealed to Khalil that in addition to the Treasury losses and the large amounts being diverted to Capcom, BCCI also was faced with enormous non-performing loans that had been advanced to the Gokal brothers in India.

Khalil told Akbar that he wanted to close out his accounts at BCCI and that he expected to be paid his share of the "profits" from the trading operations, notwithstanding his knowledge of the serious losses that BCCI's Treasury had experienced. Akbar found himself caught in the middle. His position with BCCI would erode considerably if he did not have Khalil's accounts to manage. However, it was more important to him to keep Khalil happy.

Akbar approached Naqvi and advised him of Khalil's intention to close his accounts and receive an unspecified amount of "profit." Naqvi recognized the bank's vulnerability. With the losses in Treasury,

the additional loss of significant deposits would leave the bank with precarious liquidity. Moreover, as to the issue of Khalil's desire for "profits" from BCCI's trading in Khalil's name, Naqvi explained that "because there was no written agreement with Mr. Khalil of my earlier understanding that the compensation would be about 1 percent of the amount invested, it became an open issue." Naqvi Dep. at 59.

Suspicious of Akbar's divided loyalties, Naqvi nonetheless deputized Akbar to find a way to keep Khalil as a depositor and to settle the "profit" issue. To prevent Khalil from exploiting the uncertainty concerning Khalil's share of trading profits in the future, Akbar was directed to memorialize any settlement agreement with Khalil. Akbar and Khalil negotiated the sum of $12.5 million. By letter from Akbar to Khalil dated August 16, 1985, and countersigned by Khalil, the $12.5 million payment would represent $2.5 million in realized trading profits and $10 million "from the future profits of trading account (50%)." See Pls.' Exs. 1546, 1547. The portion of that line struck out was done so at Khalil's direction. He expressly reserved the issue of payment for his nominee service with respect to BCCI Holdings shares for a separate negotiation.

Akbar had also drafted a line in the letter that read: "For the purpose of trading, I am taking time to time, a loan from the Bank in your name which will be adjusted at the close of the trading business. This is for your information only." It is undisputed that Khalil signed the letter with this line left intact. Pls.' Ex. 1546. It is further undisputed that during the course of the meeting with Akbar, after signing the letter, Khalil directed that the line referencing loans taken in his name also be struck out. Pls.' Ex. 1547.

Akbar, being a double agent in this negotiation, quickly acquiesced to both edits. When Akbar informed Naqvi of the outcome, Naqvi was staggered by the sum. He testified that he considered the payment to be "extortion," but he felt he had

no choice but to ratify the agreement. *See* Naqvi Dep. at 70. On August 20, 1985, BCCI issued a check in the amount of $12,500,000 in favor of Mr. Abdul Raouf Khalil.

Khalil admits that he directed that portions of Akbar's August 16, 1985 letter be crossed out, he admits that he signed the letter, and he admits that he received a check for $12.5 million. Khalil's characterization of this transaction, however, is quite improbable. *See* Khalil Dep. (*BCCI*) at 300–21. For example, Khalil testified that this $12.5 million payment was for the BCCI Holdings shares in his name, notwithstanding his admission that he directed that the reference to BCCI shares be struck out. Even on small points his testimony is internally inconsistent. He did not dispute that his meeting with Akbar occurred on August 16th, the date of the letter. Yet, he testified that he received the check during his meeting with Akbar, even though the check was not issued until August 20th. The Court finds that this $12.5 million was payment to Khalil from BCCI for Khalil's service as an all-purpose nominee.

## IX. KHALIL WITHDRAWS MOST OF HIS DEPOSITS FROM BCCI

The spring of 1986 was the breaking point on a number of fronts. Akbar made his last raid on the BCCI treasury. Between January and April 1986, funds in the amount of $136 million were transferred from BCCI to Capcom by United States wire using United States bank accounts. These funds were never returned to BCCI.

At that same time, Naqvi came to appreciate the full extent of the losses in Treasury. Naqvi did not realize that some of these "losses" were funds Akbar had embezzled through Capcom, but it was clear that the bank was hemorrhaging funds at an unsustainable rate. Naqvi knew he had to rein in Akbar without doing so in a way that would lead Akbar to expose the bank's true financial condition to the world. *See*

Naqvi Dep. at 179. Instead, Akbar left BCCI on his own accord.

Shortly thereafter, Akbar resurfaced at his own brokerage company, Futures Advisory Services ("FAS"), located down the hall from Capcom UK's offices. Akbar recruited his secretary, Lorna Wisdom, and other BCCI Treasury personnel to join him either at FAS or Capcom. Akbar directed Capcom's affairs from his FAS office. Akbar continued to collect a salary from BCCI until 1987.

Akbar's departure from BCCI spurred Khalil into action. In May 1986, with his partner and account manager out of the bank, and with the bank appearing to be in serious financial trouble, Khalil decided to withdraw his deposits from BCCI. Because Akbar was gone, Khalil dealt directly with Naqvi. Naqvi tried, but failed, to persuade Khalil to stay with the bank. Khalil presented Naqvi with his most recent account statements and demanded that nearly all the funds be paid to him; Khalil agreed to keep approximately 10 million Saudi riyals in a BCCI account. Khalil directed that $87 million and (pounds)3 million be transferred to Khalil's new accounts at Adham's bank, Allied Arab Bank. *See* Pls.' Ex. 1745. Khalil also raised with Naqvi the issue of the BCCI shares in Khalil's name.

Without access to Akbar's records, Naqvi agreed to pay out the amount reflected on the account statements presented by Khalil. However, to protect against a subsequent approach by Khalil to collect more in the way of deposits, Naqvi drafted language by which Khalil agreed that these payments, along with the instructions concerning the 10 million riyals, represented a full accounting of Khalil's deposits with BCCI. *See* Naqvi Dep. at 82 & Pls.' Ex. 1737.

When Naqvi and Khalil took up the subject of BCCI shares, Khalil was primarily concerned with getting the shares out of his name. Khalil had become concerned about his public association with the bank, whose financial straits were becoming

more apparent. Naqvi explained that it would take time. Khalil agreed to allow BCCI to keep the shares in his name for another 18 months. Khalil signed transfer deeds in blank and an agreement with ICIC authorizing the sale of shares in his name at any price ICIC may direct. *See* Pls.' Exs. 43 & 1747.

## X. THE $15 MILLION PAYMENT TO KHALIL/THE $17 MILLION "LOAN"

### A. $15 Million Payment

The summer of 1987 again brought a flurry of activity. Khalil requested another meeting with Naqvi. They met first on June 25, 1987. In that meeting, Khalil announced that he was withdrawing his remaining deposits and that he expected to receive another substantial payment—a parting gift, as it were—for his service as a nominee. Khalil also wanted assurance that the loan accounts in relation to both the BCCI and CCAH shares in his name would be closed. According to Naqvi, Khalil "was there to explore and exploit the situation at the time of his total separation of relationship with BCCI." Naqvi Dep. at 90. Naqvi elaborated:

> [T]here were so many other parties who were exploiting and blackmailing BCCI that I had become familiar of the manner, the tone, the approach, which underlies an extortion claim. And this was the situation which I was facing with Mr. Raouf Khalil the second time, sir.

*Id.* at 97.

Naqvi inferred, and the Court finds, that Khalil had been briefed by Akbar in preparation for this meeting, and that Akbar conspired with Khalil regarding the amount that Khalil should seek to extract from Naqvi. *See* Naqvi Dep. at 89–92. After some negotiation, Naqvi agreed to make a flat payment of $15 million in full and final settlement of all investments in Khalil's name. Under the agreement, Khalil waived any right to additional profits from the BCCI Holdings shares that had been treated as "beneficial" shares in

the books and records of BCCI. Acknowledging Naqvi's request for additional time to transfer both the BCCI and CCAH shares, Khalil agreed that these could be kept in his name for an additional two years. Khalil also agreed to sign audit confirmations to assist Naqvi with the auditors.

A follow-up meeting took place on July 2, 1987 for the purpose of documenting the $15 million agreement. Imam corroborated the timing of the July 1987 meeting and his preparations to assist Naqvi in discussing the loans and investments held in Khalil's name. Documents signed by Naqvi and Khalil during the July 1987 meeting corroborate that the $15 million was a fixed payment in respect of both First American and BCCI Holdings shares held in Khalil's name. Imam prepared the documents relating to the transaction and brought them into the meeting between Naqvi and Khalil. Khalil signed the documents during the meeting and they were returned to Imam shortly thereafter. Dr. Giles authenticated Khalil's signature on these documents.

Khalil signed an instruction letter directing that the $15 million be paid, via New York bank accounts and wires, to his account in the name Tahia Trust at Libra Bank. On July 3, 1987, the $15 million payment was wired from BCCI Overseas, Grand Cayman via bank accounts in New York. Advice of the payment was communicated from New York to Grand Cayman by United States mail. Khalil conceded that payment was made to the account designated in Pls.' Ex. 1891, and that the account was his.

### B. $17 Million "Loan"

In the June 1987 meeting, Khalil also addressed a separate issue. Previously, because of pressure from the auditors, BCCI had stopped using Capcom as its broker. Prior to the June 1987 meeting, Akbar had been contacting BCCI, seeking a $17 million loan for one of his companies. BCCI had resisted. At the June 25, 1987

meeting, Khalil asked that BCCI renew its relationship with Capcom. Naqvi explained that he could not authorize that. Khalil then pressed Naqvi to extend the loan Akbar had been seeking. Naqvi agreed to advance $17 million from BCCI to General Securities Corporation ("GESS"), a corporation owned jointly by Khalil and Akbar, which had an account at Capcom. The $17 million payment was made on June 25, 1987.

### XI. RESTRUCTURING OF CAPCOM U.S. SHAREHOLDING

Khalil was acutely aware of Naqvi's vulnerabilities in their meetings in the summer of 1987 because Khalil faced his own exposure with Capcom. Khalil's trust in Akbar, such as it was, was on the wane. Khalil had agreed to the opening of Capcom U.S. in 1985. Akbar reported to Khalil on a regular basis, but many of the day-to-day details of Capcom's business had been left to Akbar.

The opening of Capcom U.S. had invited scrutiny from the Chicago Board of Trade and other regulators in the United States. The Board of Trade had found that Capcom UK's ownership of Capcom U.S. did not provide sufficient security. Either Capcom UK would have to increase its share capital or any shareholder with a 5 percent or greater stake in Capcom U.S. would need to provide a personal guarantee. Khalil did not want to provide such a guarantee. At the same time, circumventing such a regulation by using nominee shareholders troubled him. Many of the Capcom shareholders already were nominees, including Jawhary and Adham. Having just used his own nominee status to extract a $15 million pay-off from BCCI, Khalil knew exactly how a nominee might exploit that position with him.

Moreover, at this time of increased scrutiny, Khalil met with evasive responses from Akbar when he sought specifics about the various real and fictitious arrangements that Akbar had made regarding Capcom. The Court infers that Jawhary

also advised Khalil that if regulators were ever to investigate Capcom's internal affairs, the records should reflect that directors, such as Khalil, had sought to bring the company under control.

Thus, when Khalil visited London in June 1987 to meet with Naqvi, he also had a separate meeting in Capcom UK's headquarters with Akbar and Jawhary. Khalil focused attention on the ownership of Paten Holding, which, on paper, had advanced $17 million to the Capcom UK shareholders on a non-recourse basis to fund a capital increase. In this case, Khalil testified that he and Akbar were equal owners of Paten. But the evidence is clear that in June 1987, Khalil was "furious" with Akbar, see Jawhary Dep. (*BCCI*) at 158, and wanted the record to reflect that he was the sole owner of Paten. Akbar protested; Jawhary simply wanted the matter resolved. Minutes of this meeting were prepared and signed by the participants, including Khalil. *See* Pls.' Ex. 1878. At the meeting it was agreed that Khalil was the sole beneficial owner of Paten Holding.[26]

Another topic discussed was restructuring the shareholding in Capcom US. Time was running out to meet the Board of Trade's requirements. The option to increase Capcom UK's share capital was rejected. With Akbar no longer in a position to siphon funds from the BCCI treasury, Khalil had no interest in investing his own funds in Capcom. Khalil had also made it clear that he would not provide a personal guarantee. Akbar, however, was willing to sign a guarantee. Khalil, Jawhary, and Akbar tentatively agreed to a new arrangement in which Akbar would become the largest shareholder of Capcom US, at least on paper, with a 28 percent stake. However, Jawhary proposed that they explore other restructuring options to use additional nominees.

Some further discussions clearly took place. Khalil had traveled to Chicago to discuss with shareholders, Akbar, and attorneys the restructuring of Capcom UK's shareholding in Capcom US. On August 6, 1987, The Capcom Board sent Capcom US's Chicago counsel a letter announcing the new shareholding structure of Capcom US. *See* Pls.' Ex.1945. Under the final structure, three shareholders would each hold in excess of 5 percent and would provide personal guarantees. Akbar's share had dropped to 14 percent, and the largest shareholder became Wadia Sayed Khalil, Khalil's brother, who purportedly bought 39 percent of Capcom US. On August 19, 1987, the Capcom UK Board formally ratified the new shareholding arrangement. Wadia Khalil did not testify in this case, and, from the evidence, the Court can only conclude that Khalil had found a nominee he could trust; Khalil beneficially owned the 39 percent of Capcom U.S. held in his brother's name.

Concern over Akbar's trustworthiness and increased regulatory interest in Capcom U.S. led Khalil to believe that he should disassociate himself from Capcom altogether—on paper. Separation from Capcom also meant divesting himself of Paten Holding, which was tied to Capcom on paper through the false loan agreements. During the autumn of 1987, Khalil had repeatedly requested reports from Capcom UK staff detailing the company's finances. Many of these demands were designed to pressure Akbar to be more forthcoming with Khalil in the conduct of their partnership. However, having received no satisfactory response, Khalil called for an extraordinary shareholders meeting, which was scheduled for February 5, 1988. Khalil's pressure tactics finally drew a response from Akbar, who agreed to a fixed payment to assuage Khalil's concerns regarding Akbar's em-

---

26. Subsequently, Khalil, Akbar, and Jawhary traveled to Geneva, where the lawyer who had incorporated Paten, and who acted as Paten's registered agent, resided. Khalil re-

vised the power of attorney forms to restrict Akbar from freely using Paten without Khalil's knowledge.

bezzling from their jointly-owned companies and to allow Khalil to formally disassociate himself from Capcom and Paten Holding.

Two days before the shareholders meeting, February 3, 1988, Khalil signed documents purporting to transfer his shares in Capcom and Paten Holding to Akbar for (pounds)4 million. Khalil would now be a silent partner. Khalil took no steps to record the sale of his shares or to make other interested parties aware that he had sold his shares.

On the contrary, Khalil neither attended the February 5, 1998 shareholders meeting to announce the "sale" of his interest, nor did he advise any of the other shareholders as to the reason for his absence. Indeed, Khalil affirmatively concealed the paper sale of his shares from Jawhary and from other principals and directors of Capcom. In November 1988, long after Khalil had purported to have no further interest in Capcom, Khalil executed a proxy in favor of Jawhary for an extraordinary general shareholders meeting for Capcom UK.

## XII. KHALIL'S RECORD SHAREHOLDING: BCCI, CCAH, CAPCOM

Khalil asserts that by the late 1980s, he had successfully withdrawn from his dealings with BCCI, CCAH, Capcom, and Akbar. The Court finds otherwise. Khalil took no steps to assure that the BCCI Holdings shares were ever taken out of his name. Although he had agreed with Naqvi that the shares could remain registered in his name until December 31, 1988 (itself an illegal nominee agreement), Khalil learned from Naqvi in 1989 that the shares still remained in his name. Indeed, in April 1989, another block of BCCI Holdings shares had been registered in Khalil's name. Khalil was never thereafter informed that the BCCI shares in his name were transferred to another owner, and he took no affirmative action to remedy the situation. In fact, all of the shares remained registered in the name of Khalil until April 1990, when the bulk of the shares were transferred to another share-

holder. At the time BCCI was seized in 1991, a total of 57,748 shares remained registered in Khalil's name. Those BCCI Holdings shares remained in Khalil's name until the proceeds from the sale of the nominee interests were forfeited to the United States in December 1994.

As to the CCAH shares in Khalil's name, Khalil was a nominee shareholder in the illegal acquisition and maintenance of control of First American from March 1982 onwards. Khalil told Jawhary that he had sold his interest in First American, see Jawhary Dep. (*BCCI*) at 124–25, but Khalil took no affirmative steps to have the CCAH shares taken out of his name. In addition, Capcom shares remained registered in Khalil's name until at least July 1994. Khalil continued to receive Capcom shareholder materials until at least 1993 and made no request to have his name removed from the share register.

Indeed, to show that he was never, or at least no longer, a member of a conspiracy with BCCI management, Khalil introduced evidence of a meeting between himself, Adham's attorneys, and Jawhary in 1992. At that time, the United States Department of Justice ("DOJ") and the District Attorney of New York were investigating the circumstances of CCAH's nominal acquisition of First American. DOJ officials sought statements from the record shareholders of CCAH concerning the source of the funds for their nominal investment. The meeting was held to discuss possible responses to the DOJ request. At the meeting, Khalil discussed a cover story explaining that the money for the first investment in CCAH came from a real estate transaction brokered by Khalil. *See* Jawhary Dep. (*BCCI*) at 135–44, 146–49. Shortly before pleading guilty, Adham and Jawhary submitted a signed statement with the cover story to the DOJ. Khalil, on the other hand, refused to sign. The Court finds that, at the meeting, in which his counsel was not present, Khalil had been instrumental in creating the cover story. However, after the meeting, Khalil

48

conferred with his counsel, and he subsequently refused to sign and submit a statement with the cover story to the DOJ.

Contrary to Khalil's intent in introducing this evidence, the Court finds that Khalil was again a willing co-conspirator in the cover story plot, but that he was more shrewd than his co-conspirators in assessing the risks of submitting such a tale to the DOJ. The evidence of Khalil's participation in this conspiracy lends further credence to the evidence demonstrating Khalil's participation in the nominee scheme and the Capcom conspiracy with Akbar.

## XIII. Separate Payments to Akbar

On the theory that a conspirator is liable for the acts of co-conspirators in furtherance of the conspiracy, the Liquidators also sought to hold Khalil liable for payments made by BCCI separately to Akbar. For example, in August 1988, Akbar traveled to Washington to meet with a Senate investigator about BCCI and First American. Following his meeting with the Senate investigator, Akbar sent a facsimile from Washington to London indicating that he believed that Capcom's continued success would require him to disclose harmful facts about BCCI (including the First American nominee scheme and frauds involving the Khalil accounts) to the Senate. In exchange for his silence, Akbar demanded $15 million from BCCI. Naqvi instructed CFC to make the payment by wire using United States bank accounts, to Capcom UK.

Although Akbar funneled this and other direct payments through Capcom, the Court finds that Akbar was operating outside the scope of his conspiracy with Khalil regarding these payments. Akbar is personally liable for these payments to BCCI; Khalil is not.

## DISCUSSION

■ In his answer to the complaint, Khalil asserted thirteen affirmative defenses, some of which, if accepted, would have prevented the Court from reaching the merits of this dispute. *See Khalil,* 20 F.Supp.2d at 4–7 (discussing some of these). However, at trial Khalil focused only on the merits, leaving his affirmative defenses unattended and unaddressed. For example, Khalil's counsel made no mention of the statute of limitations, imputation, or standing in his closing argument. Moreover, in Khalil's Proposed Findings of Fact and Conclusions of Law—which, in a party's best-case scenario, could be adopted as the opinion of the Court—no mention is made of any affirmative defense other than the defense as to proximate cause.[27] As a matter of caution, the Liquidators addressed issues such as imputation, adverse domination, and fraudulent concealment in their Proposed Findings and Conclusions, and Khalil did respond to those proposals.[28] But it is not up to plaintiffs to preserve defendant's affirmative defenses.

The Court finds that Khalil waived his affirmative defenses with the exception of defenses 6 and 9 related to causation.[29] Moreover, even if Khalil had preserved these issues, the Court would have found that the Liquidators are entitled to relief largely for the reasons they advance. *See*

27. In fact, that defense is not "affirmative" in that plaintiffs bear the burden to prove that their losses were proximately caused by Khalil's conduct.

28. The Court gave each party an opportunity to file a response to the other's Proposed Findings and Conclusions.

29. *See United States v. Indiana Bonding and Surety* Co., 625 F.2d 26, 29 (5th Cir.1980); *Christen G. v. Lower Merion School Dist.,* 919

F.Supp. 793, 799 (E.D.Pa.1996); *Turley v. Union Carbide Corp.,* 618 F.Supp. 1438, 1441 (S.D.W.Va.1985); *Planells v. Howard Univ.,* 1983 WL 594 *11 (D.D.C.1983); *cf. United States v. Republic Marine, Inc.,* 829 F.2d 1399, 1401–03 (7th Cir.1987); *Aviation Development Co. v. C & S Acquisition Corp.,* 1999 WL 123718 *5 (S.D.N.Y. Mar.8, 1999); *Long v. Methodist Hosp. of Indiana,* 699 N.E.2d 1164, 1166 (Ind.App.1998).

Pls.' Prop. Findings of Fact and Concl. of Law ¶¶ 112–140, 171–185.

■ Ultimately, the Court would have found that the Liquidators' claims accrued in April 1994. In addition to the reasons advanced by the Liquidators, discussion of the Supreme Court's opinion in *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 117 S.Ct. 1984, 138 L.Ed.2d 373 (1997), would have been required.[30] The Supreme Court in *Klehr* strongly implied that some discovery rule applies to the civil RICO limitations period but was less certain as to what information the plaintiff must discover to trigger the limitations period. *See Klehr*, 521 U.S. at 185–86, 191–93, 117 S.Ct. 1984. In this Circuit it has been assumed, but not decided, that the four-year limitations period for a civil RICO claim begins to run when the plaintiff discovered, or should have discovered, his injury. *See Riddell v. Riddell Washington Corp.*, 866 F.2d 1480, 1489–90 (D.C.Cir.1989). Had it been necessary, the Court would have held that even under the most restrictive of the discovery rules left intact by *Klehr*, on the facts of this case, the Liquidators' suit was timely filed.

As to the merits, the Liquidators allege that Khalil is liable under the civil RICO provision, 18 U.S.C. § 1964(c). Count I covers Khalil's role in BCCI's acquisition of First American; Count II covers Khalil's role as a nominee on BCCI's shares and for the BCCI Treasury; Count III covers Khalil's role in the operation of Capcom; and Count IV covers Khalil's use of funds from BCCI to capitalize Capcom. In addition, the Liquidators asserted three common law counts covering the same conduct: Count V alleges common law fraud; Count VI is for unjust enrichment; and Count VII is for conversion.

**OVERVIEW OF CIVIL RICO**

RICO reaches higher-level criminal organisms that have evolved beyond simple schemes and single criminal acts. The operative criminal provision is 18 U.S.C. § 1962, which creates four distinct offenses. Common to each offense is "a pattern of racketeering activity."

> The phrase 'racketeering activity' is a term of art defined in terms of activity that violates other laws, including more than 50 specifically mentioned federal statutes, which forbid, for example ... extortion, and various kinds of fraud. § 1961(1). The word 'pattern' is also a term of art defined to require 'at least two acts of racketeering activity ... the last of which occurred within ten years after the commission of a prior act of racketeering activity.' § 1961(5).

*Klehr*, 521 U.S. at 183, 117 S.Ct. 1984. Also common is some relation between the "pattern of racketeering activity" and an "enterprise," a defined term that includes corporations. *See* 18 U.S.C. § 1961(4).

> Subsection (a) renders unlawful the acquisition of any interest in or the establishment or operation of an 'enterprise' ... with the proceeds of a 'pattern of racketeering activity.' .... Subsection (b) outlaws acquiring or maintaining an interest in or control of an enterprise 'through a pattern of racketeering activity.' .... Subsection (c), the subsection most litigated, outlaws the conduct of affairs of an enterprise (under circumstances outlined in the statute) 'through a pattern of racketeering activity.' Subsection (d) adds nothing substantive to the law. Rather, it makes it unlawful to conspire to violate any of the preceding three sections.

*Danielsen v. Burnside–Ott Aviation Training Ctr.*, 941 F.2d 1220, 1224 (D.C.Cir.1991).

---

**30.** For the civil RICO claims, a four-year limitations applies. *Id.* at 183, 117 S.Ct. 1984. Moreover, that period can be tolled if the plaintiff shows that she exercised due diligence but that defendants fraudulently concealed the facts of an alleged RICO violation. *Id.* at 195–96, 117 S.Ct. 1984. Finally, *Klehr* left open the question of when a civil RICO claim accrues. *See id.* at 191, 117 S.Ct. 1984.

A special RICO provision—commonly known as civil RICO—permits '[a]ny person injured in his business or property *by reason of* a violation' of RICO's criminal provisions to recover treble damages and attorneys fees. § 1964(c). *Klehr,* 521 U.S. at 183, 117 S.Ct. 1984 (emphasis added).

## COUNT I: ACQUISITION OF FIRST AMERICAN

Count I alleges that Khalil conspired to, and did, cause injury by agreeing to hold CCAH shares as a nominee, and by undertaking certain overt acts in furtherance of that agreement. The Liquidators allege that the injuries for which they seek to recover were proximately caused by Khalil's violation of 18 U.S.C. § 1962(b). That section provides:

> It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to *acquire or maintain, directly or indirectly, any interest in or control of any enterprise* which is engaged in, or the activities of which affect, interstate or foreign commerce.

18 U.S.C. § 1962(b) (emphasis added). To recover on this claim the Liquidators must have proven: (1) that First American was an "enterprise"; (2) that Khalil acquired or maintained an interest in First American; (3) that such acquisition or maintenance involved violations of two or more specified federal laws within 10 years; (4) that those violations were related and continuous; and (5) that the BCCI corporate entities were injured "by reason of" (1) – (4). The Liquidators also allege in Count I that Khalil conspired with former BCCI management to acquire an interest in First American in violation of § 1962(b) and that the conspiracy also proximately caused the BCCI Group harm.

### A. First American is an "Enterprise"

■ A RICO "enterprise" includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). An enterprise is established by a common purpose among the participants, organization, and continuity. *United States v. Richardson,* 167 F.3d 621, 625 (D.C.Cir.1999). An enterprise is engaged in interstate and foreign commerce when it is "directly engaged in the production, distribution, or acquisition of goods and services in interstate commerce." *United States v. Robertson,* 514 U.S. 669, 672, 115 S.Ct. 1732, 131 L.Ed.2d 714 (1995) (citations omitted). The interstate commerce requirement is met if either the activity of the enterprise or the predicate acts of racketeering affect interstate commerce. *R.A.G.S. Couture, Inc. v. Hyatt,* 774 F.2d 1350, 1353 (5th Cir.1985). First American was a multistate banking group—an enterprise—routinely engaged in interstate and foreign commerce.

### B. Whether Khalil Directly or Indirectly "Acquired or Maintained" an "Interest In" or "Control Of" of First American

The Liquidators argue that Khalil can be held to have violated § 1962(b) so long as he "participated in a pattern of racketeering activity to acquire and maintain an interest in or control of First American." *See* Pls.' Prop. Findings and Concl. ¶ 211. This statement conflates their claims in Count I against Khalil for directly violating § 1962(b) and conspiring to assist BCCI in violating § 1962(b). For Khalil to have violated § 1962(b), it is necessary that he acquired an interest in or control of First American.

The Liquidators proved that Khalil directly acquired a nominal interest in First American by becoming a record shareholder of CCAH. But, according to the evidence, Khalil did not acquire a beneficial interest in First American. BCCI, by contrast, acquired both a beneficial interest in, and control of, First American indirectly, through the nominees.

■ Acquiring beneficial stock ownership in a corporation undoubtedly is "ac-

quisition" of "an interest in" an "enterprise" within the meaning of 18 U.S.C. § 1962(b). *E.g., Whaley v. Auto Club Ins. Ass'n,* 891 F.Supp. 1237, 1240–41 (E.D.Mich.1995); *Moffatt Enter., Inc. v. Borden, Inc.,* 763 F.Supp. 143, 147 (W.D.Pa.1990); *cf. Teague v. Bakker,* 35 F.3d 978, 994–95 n. 23 (4th Cir.1994). Accordingly, BCCI, as the beneficial owner of the CCAH shares in Khalil's name, acquired an interest in First American, and, as is discussed below, Khalil conspired with BCCI management to facilitate BCCI's acquisition of that interest through a pattern of racketeering activity.

The harder question is whether Khalil, as the nominal owner of the stock beneficially owned by BCCI, can also be held liable under § 1964(c) for directly violating § 1962(b). A § 1962(b) "interest" in an enterprise is a proprietary one:

> The common or dictionary definition of ["interest"] includes 'right, title or legal share in something; participation in advantage, profit and responsibility.' . . . . It has also been defined as '(t)he most general term that can be employed to denote a right, claim, title, or legal share in something.' . . . . So defined, 'interest' in fact encompasses all 'property rights' in a business enterprise.

*United States v. Jacobson,* 691 F.2d 110, 112–13 (2d Cir.1982) (per curiam);[31] *see also Keystone Helicopter v. Textron, Inc.,* 1997 WL 786453 *2 (E.D.Pa. Dec.2, 1997); *Nafta v. Feniks Int'l House of Trade,* 932 F.Supp. 422, 428 (E.D.N.Y.1996).

■ Adopting this broad understanding of "interest," this Court finds that holding legal title to corporate stock that is beneficially owned by another is a sufficient "interest" in an enterprise to incur liability under § 1962(b).

> [T]he law recognizes the general principle that the legal title to shares may be in one person; that is, the holder of the

stock certificate, whereas equitable ownership of all the shares, or a portion thereof, may be in another person. The whole beneficial interest in the shares may belong to others, or others may be beneficially interested with the registered owner or certificate holder . . . .

*Blanton v. Austin,* 392 S.W.2d 140, 143 (Tex.Civ.App.1965). Both the holder of legal title and the beneficial owner have proprietary interests in the corporation. *Cf. Student Loan Marketing Ass'n v. Riley,* 104 F.3d 397, 407 (D.C.Cir.1997) (ownership of legal title alone is a proprietary interest in the student loan context). The holder of title has the power to exercise the rights over the property. Failure to do so in accord with the wishes of the beneficiary may expose the title holder to separate liability, but the nominal owner is empowered to exercise proprietary rights nonetheless. This power is a sufficient to be considered an "interest in" the corporation within the ambit of § 1962(b). *See Jacobson,* 691 F.2d at 113.

In addition, on these facts, Khalil indirectly exercised control over First American. Khalil's considerable economic leverage over BCCI allowed him to control BCCI in certain respects. As Naqvi testified, BCCI had little choice other than to meet Khalil's demands for payment as a nominee. Because BCCI had actual control over First American, Khalil's power to control BCCI gave him derivative control over First American. *Cf. In re Am. Honda Motor Co., Inc. Dealerships Relations Litig.,* 958 F.Supp. 1045, 1054–55 (D.Md. 1997). For example, in 1984, Robert Altman authorized special treatment for Khalil when Khalil sought to cash his travelers checks. More importantly, Altman gave Khalil a briefing on First American's prospects in recognition of Khalil's power to demand such information. This is sufficient control for purposes of § 1962(b).

---

**31.** Reading the provisions of RICO *in pari materia, Jacobson* interpreted "interest" as used in § 1962(b) as the Fifth Circuit interpreted the term "interest" in the RICO forfeiture provision, § 1963. *See United States v. Martino,* 681 F.2d 952 at 954, 955–56 (Former 5th Cir.1982) (en banc).

## C. Khalil's Pattern of Racketeering Activity

The Liquidators have also proven that Khalil's conduct in relation to BCCI's illegal acquisition of First American was part of a "pattern of racketeering activity." That element requires (1) at least two predicate acts of racketeering within ten years which are (2) related; and (3) have continuity. *H.J., Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989); *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985).

### 1. Predicate Acts

The predicate acts of racketeering in defendants' acquisition of First American included multiple acts of (1) wire and mail fraud in violation of 18 U.S.C. §§ 1341 and 1343; (2) bank fraud in violation of 18 U.S.C. § 1344; (3) travel and transportation in aid of racketeering in violation of 18 U.S.C. § 1952; (4) money laundering in violation of 18 U.S.C. § 1956; and (5) extortion in violation of 18 U.S.C. § 1951(b)(2).

### (a) Wire Fraud/Mail Fraud

Wire and mail fraud require a "scheme to defraud" and the use of wires in interstate or foreign commerce, or of the United States mail, to further that scheme. *United States v. Lemire*, 720 F.2d 1327, 1334–35 (D.C.Cir.1983).[32] To establish a violation of the wire and mail fraud statutes, proof is required only of a scheme to defraud, not the commission of the fraud itself. *United States v. Reid*, 533 F.2d 1255, 1264 (D.C.Cir.1976). In addition, "[a]ll that is required is that [defendant] have knowingly and willfully participated in the scheme; she need not have performed every key act herself." *United*

States v. Maxwell, 920 F.2d 1028, 1035 (D.C.Cir.1990).

A wire or mailing is in furtherance of an alleged scheme if it is "incident to an essential part of the scheme, or a step in the plot." *Schmuck v. United States*, 489 U.S. 705, 710–11, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989) (citations and internal quotations omitted). Communications need not be fraudulent in themselves to serve as RICO predicates, as long as they further a fraudulent scheme. *United States v. Pemberton*, 121 F.3d 1157, 1170–71 (8th Cir.1997); *Reid*, 533 F.2d at 1265. Nor is it required that a defendant be shown specifically to have intended to use the wires or mail service if their use was reasonably foreseeable. *United States v. Ross*, 131 F.3d 970, 981 (11th Cir.1997), *cert. denied*, 119 S.Ct. 258 (1998).

A person commits wire or mail fraud if he causes an interstate or international wire communication or mailing to be made; it is not necessary that the person actually make the communication or even personally instruct that the communication be made. *United States v. Rogers*, 9 F.3d 1025, 1030 (2d Cir.1993). Under the wire fraud statute, "an act [can be] caused not simply when it is a physical consequence of the person's conduct but when, in addition, the actor either knew the consequence would occur or its occurrence was reasonably foreseeable." *Id.* (citation and internal quotations omitted). A defendant may cause an interstate or international wire communication by placing an intrastate wire communication which foreseeably leads the financial institution with which the defendant is dealing to in turn place an interstate or international communication. *United States v. De Biasi*, 712 F.2d 785, 791 (2d Cir.1983).

---

**32.** The requisite elements of "scheme to defraud" under the wire fraud statute, 18 U.S.C. § 1343 and the mail fraud statute, 18 U.S.C. § 1341, are identical. Thus, cases construing mail fraud apply to wire fraud as well. *See United States v. Maxwell*, 920 F.2d 1028, 1035 n. 8 (D.C.Cir.1990). In 1988, Congress enacted 18 U.S.C. § 1346, which ratified *Lemire's* holding that the object of a scheme to defraud could be deprivation of intangible property interests. *See* 18 U.S.C. § 1346; *Lemire*, 720 F.2d at 1336.

■ As set forth above, numerous specific acts constituting use of interstate and international wires and United States mail, such as wire transfers of U.S. dollars cleared through financial institutions in the United States, took place in furtherance of the scheme to fraudulently acquire First American. These uses of wires and the United States mail were vital to the scheme to defraud because they authorized and effected the transfer of funds for the illegal acquisition of First American. Khalil authorized this use of wires and United States mail when he agreed that BCCI could take whatever actions it deemed necessary to purchase CCAH shares in his name. Use of United States mail and international wires was clearly foreseeable.

**(b) Travel Act**

■ Violation of the Travel Act requires; (1) travel in interstate or foreign commerce or use of a facility in foreign or interstate commerce; (2) with the intent to promote an unlawful activity; and (3) the performance or attempted performance or the facilitation of the performance of an overt act in furtherance of the unlawful activity. *United States v. Childress*, 58 F.3d 693, 719 (D.C.Cir.1995) (citations omitted). Congress targeted the Travel Act not toward "sporadic, casual involvement [in the predicate offenses], but rather toward a continuous course of conduct sufficient for it to be termed a business enterprise." *United States v. Auerbach*, 913 F.2d 407, 411 (7th Cir.1990). However, one instance of interstate travel is sufficient to establish interstate racketeering if defendant travels to further an illegal activity. *United States v. Vanichromanee*, 742 F.2d 340, 349 (7th Cir.1984). And, in the case of a conspiracy, it is immaterial whether defendant personally caused or knew of interstate travel because, as a co-conspirator, he is liable for other partici-

pants' acts in furtherance of the conspiracy.[33]

The "use of a facility in commerce" includes use of the United States mails, *United States v. Heacock*, 31 F.3d 249, 255 (5th Cir.1994); the making of interstate telephone calls and telegraphs, *United States v. Jenkins*, 943 F.2d 167, 172–73 (2d Cir.1991); and the interstate wire transfer of funds, *United States v. Antonick*, 481 F.2d 935, 938 (9th Cir.1973).

■ In furtherance of their scheme to acquire nominal interests in First American for the benefit of BCCI, Khalil and Akbar violated 18 U.S.C. § 1952(a) by traveling in interstate and foreign commerce with the intent of furthering unlawful activity and thereafter engaging in such unlawful activity. For example, in 1981, Khalil, Akbar and others traveled from London to the District of Columbia for purposes of meeting with other nominee shareholders of the First American enterprise, consulting with attorneys, and testifying in front of the Federal Reserve with regard to the proposed purchase of the First American enterprise.

■ Additionally, Khalil was responsible for the use of a facility in commerce in furtherance of the scheme to defraud. In the course of this scheme, Khalil and Akbar, acting singly and in concert with Abedi and Naqvi, transferred the funds used to purchase shares in First American from accounts abroad to the United States and from the United States to accounts abroad with the intent to promote the carrying of their fraudulent ownership and management scheme and to conceal or disguise the nature, the location, the source, the ownership, and the control of the proceeds of their unlawful activity, in violation of 18 U.S.C. § 1952(a).

Subsequent to his 1981 trip to Washington, D.C., Khalil signed transfer deeds in

---

**33.** *See Auerbach*, 913 F.2d at 410–11 & n. 2; *see also* Annotation, *Interstate travel as element of offense established by Travel Act*, 69 A.L.R. Fed. 251 § 8 (1984 & 1998 Supp.); *see* *generally* Steven G. Shapiro, *Travel Act* in Project, *White Collar Crime: Fourth Survey of Law of Substantive Crimes*, 24 AM.CRIM L.REV. 735 (1987).

blank and undertook other overt acts in furtherance of the scheme by which he had acquired a nominal interest in First American.

### (c) Money laundering

The requirements to prove money laundering in violation of 18 U.S.C. § 1956 differ depending on whether the offense is domestic or international. *See United States v. Piervinanzi*, 23 F.3d 670, 680 (2d Cir.1994); Barrett Atwood & Molly McConville, *Money Laundering in Project, Fourteenth Survey of White Collar Crime*, 36 AM.CRIM.L.REV. 901, 904 (1999) [hereafter *Mail Fraud* ].

■■■ Illegal money laundering within the United States requires that the defendants knowingly conducted a financial transaction or transferred funds which were the proceeds of illegal activity to promote the illegal activity or to disguise the nature, location, source or control of the proceeds. 18 U.S.C. § 1956(a)(1); *United States v. Wynn*, 61 F.3d 921, 924 (D.C.Cir.1995). In a complex routing transaction, each transfer of funds, if it affects interstate or foreign commerce, can be a separate § 1956(a)(1) violation. *See* Atwood & McConville, *Mail Fraud* at 916–17. But the defendant must know that the proceeds with which he conducts the financial transaction are tainted. *United States v. Quintero*, 165 F.3d 831, 838 (11th Cir. 1999); *Piervinanzi*, 23 F.3d at 680.

■■■ By contrast, international money laundering in violation of § 1956(a)(2) does not require that "proceeds" first be generated by illegal activity, followed by a financial transaction with those proceeds. Instead it penalizes an overseas transfer "with the intent to promote the carrying on of specified unlawful activity." *Piervinanzi*, 23 F.3d at 680 (quoting § 1956(a)(2)(A)); *see also Quintero*, 165 F.3d at 838.

There is some circularity in considering international money laundering as a predicate "racketeering activity" under RICO

as defined in 18 U.S.C. § 1961(1). This is because the "specified unlawful activities" that are predicates for an international money laundering violation under § 1956(a)(2)(A) also are those offenses listed in § 1961(1). *See* 18 U.S.C. § 1956(c)(7)(A).

■■■ Khalil violated § 1956(a)(2) when he agreed to the transfer of funds to the United States to purchase CCAH shares in his name so as to further BCCI's fraudulent takeover of First American through BCCI's nominees.

### (d) Extortion

■■■ Khalil also engaged in the RICO predicate act of extortion, defined as the "obtaining of property from another with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2). Fear of economic, rather than physical harm, is sufficient to establish an extortion claim under § 1951. *United States v. Tomblin*, 46 F.3d 1369, 1382 (5th Cir.1995). The required effect on interstate commerce is *de minimis. Id.* at 1383–84; *United States v. Debs*, 949 F.2d 199, 202 (6th Cir.1991). Extortion under D.C.CODE ANN. § 22–3851 is similarly defined.

■■■ In the course of the scheme to acquire and maintain controlling interest in First American, Khalil demanded payment from the BCCI Group in exchange for his agreement not to disclose the scheme and to continue his services as a nominee shareholder. Disclosure of the scheme would have substantially injured the BCCI Group, exposing it to financial loss and criminal prosecution. Payment of the extortion, at least the $15 million payment, affected foreign and interstate commerce. Khalil's threats in exchange for payment constituted extortion in violation of 18 U.S.C. § 1951.

### (e) Financial institution fraud

█ Finally, Khalil also conspired to, and did, commit bank fraud in violation of 18 U.S.C. § 1344. That section prohibits engaging in or attempting to engage in a pattern or course of conduct designed to deceive a federally chartered or insured financial institution into releasing property with intent to victimize the institution by exposing it to actual or potential loss. *United States v. Stavroulakis*, 952 F.2d 686, 694 (2d Cir.1992). The financial institution need not incur loss nor must the defendant personally benefit from the scheme to defraud. *See United States v. Goldblatt*, 813 F.2d 619, 624 (3d Cir.1987); *see also United States v. Moede*, 48 F.3d 238, 242 (7th Cir.1995).

█ Khalil and his co-conspirators defrauded the First American banks, a financial institution within the meaning of 18 U.S.C. § 20, by concealing the material fact that First American's capitalization was being illegally diverted from BCCI through nominee loans, that First American's shares were pledged to secure purported loans to the nominee shareholders and that First American was illegally owned by a foreign banking group. Khalil, in conspiracy with Akbar and BCCI's senior officers, knowingly presented false testimony to the Board of Governors of the Federal Reserve Bank. In addition, the Liquidators established that Khalil knowingly participated in the misrepresentation of the First American investment as loans to Khalil, thereby falsifying BCCI's own books and records. This scheme was undertaken with specific intent to defraud and exposed First American to risk of loss.

### 2. Relatedness and Continuity

█ To form a "pattern" of racketeering activity, the aforementioned predicate acts need be "related" and "continuous." The indicia of relatedness between predicate acts include common: purpose, result, participants, victims, and methods of commission. *H.J., Inc.*, 492 U.S. at 240, 109 S.Ct. 2893. The concept of continuity is primarily a temporal one. *Pyramid Securities, Ltd. v. International Bank*, 726 F.Supp. 1377, 1382 (D.D.C.1989), *aff'd*, 924 F.2d 1114 (D.C.Cir.1991). Continuity is measured by a "commonsense" approach, *H.J., Inc.*, 492 U.S. at 241, 109 S.Ct. 2893, focusing on the number and variety of predicate acts, the number of victims, the number of perpetrators, the presence of separate schemes, and the occurrence of distinct injuries. *See Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1264–65 (D.C.Cir.1995); *Edison Elec. Inst. v. Henwood*, 832 F.Supp. 413, 417–18 (D.D.C.1993).

█ In this case, the aforementioned acts of racketeering had the same or similar unlawful purposes, results, participants and victims and were not isolated events. The common theme of these multiple racketeering acts was illegally to acquire and maintain an interest in and control of the First American enterprise, nominally for Khalil and other nominee shareholders, by using BCCI Group funds to conceal the existence of that control, and to use that control for the benefit of the co-conspirators. These acts were essential elements of the unlawful scheme, were carried out within 10 years (and beyond), and constituted a pattern of racketeering in violation of § 1962(b).

Khalil agreed to participate in the nominee conspiracy, and he took no affirmative steps to withdraw from the scheme. Rather, Khalil specifically agreed to allow BCCI to continue to hold First American shares in his name until December 1988. Even after that time, he knew that the shares remained in his name, and he took no steps to remedy the situation or to bring the nominee scheme to the attention of the authorities. The Liquidators met their burden to prove that Khalil directly violated § 1962(b).

### 3. Proximate Cause

█ Because Count I is a civil RICO claim, § 1964(c) requires that the Liqui-

dators show injury caused "by reason of" Khalil's violation of § 1962(b).[34] The statute's "by reason of" phrase incorporates the principle of proximate causation. *See Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 265–68, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992). The damage must be caused by the violation of § 1962 as opposed to by the predicate acts alone. *See Lightning Lube, Inc. v. Witco*, 4 F.3d 1153, 1190 (3d Cir.1993). Thus, at trial, the Liquidators had the burden to demonstrate injury flowing proximately from Khalil's acquisition of his nominal interest in, and actual control over, First American through a pattern of racketeering activity. *Danielsen v. Burnside–Ott Aviation Training Center Inc.*, 941 F.2d 1220, 1231 (D.C.Cir.1991).

▆ The parties agree that a defendant's acts proximately cause plaintiffs injuries when such acts are a substantial factor in the sequence of responsible causation, and where the plaintiff's injury was reasonably foreseeable or anticipated as a natural consequence of those acts. *See First American Corp. v. Al–Nahyan*, 17 F.Supp.2d 10, 22 (D.D.C.1998); *see also In re American Express Co. Shareholder Litig.*, 39 F.3d 395, 399 (2d Cir.1994).

▆ At trial, the Liquidators proved that BCCI's investment in First American was economically detrimental. BCCI invested a total of $556,108,245, through its nominees, to acquire First American. After the Liquidators entered a guilty plea on behalf of BCCI to the criminal charges pending in this Court, BCCI's interests in First American were forfeited to the United States. From the liquidation of First American, $277,884,166 has been paid to the Liquidators. *See* Tr. (Gilkes) at 322–28. This being a negative return on investment, the Liquidators claim that the $278,224,079 loss is proximately attributable to Khalil's participation in the nominee scheme. Additionally, the Liquidators

claim that the opportunity cost of BCCI's illegal investment in First American was $334,818,884.

However, the Court cannot find that these losses were proximately caused by Khalil's participation in the nominee scheme. Although it was foreseeable at the time Khalil participated in the scheme that BCCI was exposing itself to criminal liability which could result in the forfeiture of its First American holdings, too many intervening factors, such as changing market conditions over a considerable period of time and numerous independent decisions by First American management, led to these losses that the Liquidators seek to attribute to Khalil. *See Powers v. British Vita, P.L.C.*, 57 F.3d 176, 189 (2d Cir. 1995); *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 769–72 (2d Cir.1994).

On the other hand, other losses were directly attributable to Khalil's acquisition of a nominal interest in First American through a pattern of racketeering activity. For example, the $27.5 million paid to Khalil, although extorted from BCCI, was a transaction cost proximately imposed on BCCI by virtue of its use of nominees to accomplish the illegal acquisition of, and maintain its control over, First American. Additionally, payment of Khalil's expenses for his services as a nominee also were proximately caused by the pattern of racketeering activity by which Khail and BCCI acquired their respective interests in First American.

### D. Conspiracy

▆ In addition to alleging a direct violation of § 1962(b), Count I also charged Khalil with conspiracy to violate § 1962(b). Subsection (d) makes it unlawful "to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." 18 U.S.C. § 1962(d). "A con-

---

**34.** A civil RICO claim may be brought by "[a]ny person injured in his business or property by reason of a violation of section 1962 ... in any appropriate United States district court...." 18 U.S.C. § 1964(c).

spiracy is a partnership in crime." *Pinkerton v. United States*, 328 U.S. 640, 644, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). To be liable under § 1962(d),

[a] conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor.

*Salinas v. United States*, 522 U.S. 52, ——, 118 S.Ct. 469, 477, 139 L.Ed.2d 352 (1997). A conspirator need not agree to commit or facilitate each and every part of the substantive offense; if the partners agree to pursue the same criminal objective and divide up the work, each is responsible for the acts of the other. *See id.* Indeed, "[a] person, moreover, may be liable for conspiracy even though he was incapable of committing the substantive offense." *Id.*

 A conspirator remains party to the conspiracy unless and until he admits his participation to the authorities or communicates his abandonment in a manner reasonably calculated to reach co-conspirators. *See United States v. Thomas*, 114 F.3d 228, 267 (D.C.Cir.), *cert. denied*, —— U.S. ——, 118 S.Ct. 635, 139 L.Ed.2d 614 (1997). Once proof of a conspiracy is established, defendant has the burden of proving that he affirmatively withdrew from the conspiracy. *Id.* at 269.

 For the reasons set forth above, Khalil's agreement to act as an all-purpose nominee for BCCI, and his specific agreement to act as a nominee in BCCI's acquisition of First American makes him liable under § 1962(d).

In addition, the direct payments to Khalil and payment of his expenses also were proximately caused by this conspiracy. It is hornbook law that

[o]nce the conspiracy has been formed, all its members are liable for injuries caused by acts pursuant to or in furtherance of the conspiracy. A conspirator need not participate actively in or benefit from the wrongful action in order to be found liable. He need not even have planned or known about the injurious action ... so long as the purpose of the tortious action was to advance the overall object of the conspiracy.

*Halberstam v. Welch*, 705 F.2d 472, 481 (D.C.Cir.1983). Khalil's agreement to act as a nominee was essential to BCCI management's obtaining regulatory approval for its illegal acquisition of First American. And, that approval was an essential link in the causal chain leading to the BCCI Group's injuries. The Liquidators are entitled to judgment on Count I.

### COUNT II: OPERATION OF BCCI

Count II alleges that Khalil violated 18 U.S.C. § 1962(c) and conspired with, among others, Akbar, Abedi, and Naqvi to violate subsection (c). Section 1962(c) makes it unlawful

for any person *employed by or associated with any enterprise* engaged in, or the activities of which affect, interstate or foreign commerce, to *conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs* through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c) (emphasis added).

For purposes of Count II, the RICO enterprise in question is the BCCI Group entities.[35] The BCCI Group was an international banking group with operations in the United States. There is little doubt that the BCCI Group was an "enterprise" within the statute's meaning. Moreover, the Liquidators adduced considerable unrebutted evidence that the affairs of the BCCI Group were conducted through a

---

**35.** Count II is unclear as to whether First American, as an actual subsidiary of BCCI, is part of the enterprise. It appears that the Liquidators have defined the enterprise as only the BCCI Group entities. The Court will accept that definition, as the inclusion of First American would have no impact on the Court's conclusion as to Count II.

pattern of racketeering activity. For example, the circular routing of transactions by BCCI's Treasury unit involved the use of interstate and international wires and United States mail, including wire transfers of United States dollars cleared through accounts in financial institutions in the United States, in furtherance of the nominee scheme and with specific intent to defraud. These wires and mailings were vital to the scheme in that they authorized and effected transfers of funds for the purchase of BCCI shares and disguised non-performing loans and other losses. Moreover, Akbar, Khalil, and others associated with BCCI extorted money from the enterprise in exchange for allowing its illegal activities to further go undetected.

As detailed above, this scheme had several main elements, including (a) the use of Khalil as a nominee shareholder, thereby falsely inflating the BCCI Group's apparent capitalization; (b) using Khalil and Khalil-affiliated accounts to adjust and thereby conceal non-performing loans on the books of the BCCI Group; (c) using Khalil and Khalil-affiliated accounts to create the false appearance that the BCCI Group was earning profits on loans to purchase real property; and (d) using Khalil and Khalil-affiliated accounts to conceal the use of BCCI Group Treasury funds in high-risk commodities, options and futures trading and to create the false appearance of profits to the BCCI Group in connection with sham commodities, options and futures trading by concealing trading losses in accounts in the name of Khalil for which he had no liability.

Khalil, acting singly and in concert with Akbar, Abedi and Naqvi, transferred funds from accounts abroad to the United States and from the United States to accounts abroad with the intent to promote the carrying on of their fraudulent scheme, and to conceal or disguise the nature, the location, the source, the ownership and the

control of the proceeds of their unlawful activity, in violation of 18 U.S.C. § 1956(a)(1) & (2).

These acts of wire fraud and money laundering had the same or similar unlawful purposes, results, participants and victims and were not isolated events. They were part of the scheme to operate the BCCI enterprise through a fraudulent nominee scheme and continued within a ten-year period. *See Edison Elec. Inst.,* 832 F.Supp. at 417 (four-year scheme continuous); *Tabas v. Tabas,* 47 F.3d 1280, 1290–91 (3d Cir.1995) (scheme lasting over three years meets RICO's continuity requirement).

### A. Operation of Management of BCCI

Additionally, to recover under § 1962(c), the Liquidators had to show that Khalil was associated with an enterprise and participated in the conduct of the enterprise's affairs through a pattern of racketeering activity causing injury. *Danielsen v. Burnside–Ott Aviation Training Center,* 941 F.2d 1220, 1231 (D.C.Cir.1991).

▮ Khalil clearly was "associated with" the enterprise, but the Liquidators also were required to show that Khalil participated in the conduct of the enterprise. Under the "operation or management" test, section 1962(c) liability is "not limited to those with a formal position in the enterprise, but some part in directing the enterprise's affairs is required." *Reves v. Ernst & Young,* 507 U.S. 170, 179, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993) (footnote omitted).[36]

*Reves* provided minimal guidance as to what categories of participants in a formal corporate enterprise might satisfy the operation or management test, stating only that the enterprise may be operated at least by:

*Chauffeurs & Helpers Local Union 639,* 913 F.2d 948, 954–56 (D.C.Cir.1990) (en banc).

---

**36.** In *Reves,* the Supreme Court adopted, in large measure, the interpretation of § 1962(c) advanced in *Yellow Bus Lines, Inc. v. Drivers,*

upper management, lower-rung participants in the enterprise who are under the direction of upper management, or others associated with the enterprise who exert control over it, as for example, by bribery.

*MCM Partners, Inc. v. Andrews–Bartlett & Assoc.*, 62 F.3d 967, 977 (7th Cir.1995) (quotations omitted) (citing *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 521 (2d Cir.1994)). Certainly Akbar, Abedi, and Naqvi were "upper management" covered by § 1962(c), and there is no doubt that those three individuals violated subsection (c) through the implementation of the nominee scheme. However, classifying a nominee shareholder and one of the bank's largest creditors (i.e. depositors), such as Khalil, is more difficult.

The *Reves* Court reserved decision on "how far § 1962(c) extends down the ladder of operation," 507 U.S. at 184 n. 9, 113 S.Ct. 1163, and left unmentioned whether those at the top of the ladder, shareholders and directors, may also be held to participate in the conduct of the enterprise. This question has received little attention to date. One court has suggested in passing that a controlling shareholder's power to direct the operation or management of the enterprise was sufficient to satisfy the operation or management test. *See LSJ Investment Co. v. O.L.D., Inc.*, 167 F.3d 320, 324 (6th Cir.1999). Another court, however, has suggested that a RICO complaint alleging a § 1962(c) violation cannot rest on the allegation that the defendant was president and principal shareholder, requiring some allegations as to how the defendant operated or managed the enterprise. *See Taylor v. Bob O'Connor Ford, Inc.*, 1999 WL 183656 *2 n. 4 (N.D.Ill. Mar.25, 1999).

*Reves* suggests that some form of actual control must be exercised, whether by insiders carrying out the enterprise's day-to-day business or by outsiders exercising some form of coercion over the enterprise, be that economic (e.g., bribery) or otherwise. With regard to insiders, the most difficult issue under this analysis is whether § 1962(c) liability may attach to a shareholder or director (1) who is in a position to exercise some control over those who operate or manage an enterprise; and (2) who has actual or constructive knowledge that the enterprise is being conducted through a pattern of racketeering activity; (3) but who does nothing active to facilitate the operation of the enterprise in such fashion. Had Khalil persuaded this Court that he was the beneficial owner of the BCCI Holdings shares in his name, this issue would have been reached.

However, because Khalil was only a nominee the Court must address the issue in slightly different fashion. Because Khalil never sought to exercise any of the voting rights of a BCCI shareholder, and because he had assigned those rights to ICIC, he was outside the formal corporate chain of command. Nonetheless, Khalil still was in a position to exert considerable control over the conduct of BCCI's affairs. BCCI's extensive reliance on the use of Khalil's name and the name of his companies gave Khalil considerable leverage over the bank. In addition, as one of the bank's largest depositors, Khalil was one of its biggest creditors.[37] In colloquial terms, if Khalil had said "jump," Naqvi and Abedi would have had to respond "how high?" But Khalil exercised that leverage only to extort substantial amounts from the bank for his own benefit and to arrange for certain benefits to flow to Capcom and Akbar. Otherwise, Khalil did not concern himself with the details of any of the nominee transactions.[38] *Reves* requires some-

---

**37.** A bank deposit is, in essence, a loan, and depositors are creditors of the bank. *See Bank of Marin v. England*, 385 U.S. 99, 101, 87 S.Ct. 274, 17 L.Ed.2d 197 (1966); *United States v. BCCI Holdings (Luxembourg) S.A.*, 833 F.Supp. 9, 13–14 (D.D.C.1993), *aff'd*, 46 F.3d 1185, 1191 (D.C.Cir.1995).

**38.** In the Liquidators' Proposed Findings and Conclusions, constant reference under Count

thing more. In the absence of evidence that Khalil actually exercised some control over the conduct of the BCCI Group, Khalil cannot be held civilly liable under § 1964(c) for a violation of 1962(c).

## B. Conspiracy

■ However, Count II also includes a conspiracy charge under § 1962(d). A person can conspire to violate § 1962(c) even when that person is not in a position to operate or manage the enterprise. *See Salinas,* 118 S.Ct. at 477; *MCM Partners, Inc.,* 62 F.3d at 979; *see also United States v. Thomas,* 114 F.3d 228, 242–43 (D.C.Cir.1997); *cf. United States v. Antar,* 53 F.3d 568, 580–81 (3d Cir.1995); *United States v. Viola,* 35 F.3d 37, 43 (2d Cir.1994); *Jones v. Meridian Towers Apartments, Inc.,* 816 F.Supp. 762–773 (D.D.C.1993). Indeed, a § 1962(d) conspirator must only agree to a scheme that will violate § 1962(c) without committing, or agreeing to commit, the predicate acts himself. *Salinas,* 118 S.Ct. at 478 (overruling *Viola,* 35 F.3d at 43, to the extent that it required that the conspirator to agree commit the predicate acts himself); *see Thomas,* 114 F.3d at 242–43; *see also United States v. Hoyle,* 122 F.3d 48, 50 & n. 3 (D.C.Cir.1997).

■ In this case, Khalil agreed and conspired with Akbar, Naqvi, Abedi, and others, to act as a nominee for those who operated and managed BCCI through a pattern of racketeering activity. The purpose of the scheme was to manipulate the assets, liabilities and capital, as well as the profits and losses, of the BCCI entities to give the false appearance of solvency and profitability. To this end the conspirators falsified BCCI's books and

records to conceal from the BCCI Group and from regulators, creditors and depositors, that plaintiffs were in fact insolvent and unprofitable. This scheme permitted the BCCI Group companies to continue to operate, thereby allowing defendants to plunder the assets of plaintiffs for their own benefit.

Khalil did not know all of the specific details relating to the transactions undertaken in his name, but each co-conspirator need not have full knowledge as to the details of the illegal operations. Khalil "adopt[ed] the goal of furthering or facilitating ... the endeavor" and is liable as a co-conspirator. *Salinas,* 118 S.Ct. at 472. Indeed, in a case arising out of the well publicized savings and loan scandal in this country, a District Court upheld a jury verdict under § 1962(d) against a nominee like Khalil who "played the part of a straw man and furthered the scheme by entering into sham real estate transactions which generated artificial profits" for the financial institutions. *See In re American Continental Corp.,* 28 F.3d 104, 1994 WL 201195 (9th Cir. May 23, 1994) (unpublished disposition cited only for its report of the District Court's decision).

Applying § 1964(c)'s causation element to a § 1962(d) violation requires that the conspiracy, rather than the substantive RICO violation or the predicate acts, be the proximate cause of plaintiffs' injuries. In this case, as a direct and proximate result of defendants' agreement to conduct the affairs of the BCCI enterprise through a pattern of racketeering activity, the BCCI Group and its innocent creditors and depositors were injured in their business and property, as contemplated by § 1964(c). Khalil's agreement to act as a

II is made to "Khalil and Akbar" as a unit. Implicitly, this suggests a baroque theory for § 1962(c) liability under which Akbar's actions in conducting the affairs of BCCI are imputed to Khalil through the separate Khalil–Akbar conspiracy. It may be that such a theory is viable, but because of the Court's holdings on Counts II and III it is not necessary to pass on it. Akbar was operating on

three levels while managing the BCCI Treasury Division and Khalil's accounts. In most transactions he acted within the scope of Naqvi's directions, and thus within the nominee conspiracy. In other respects, he acted within the scope of the Khalil–Akbar partnership, but those actions are covered by Count III. Finally, in other respects, Akbar acted for his own account only.

nominee was integral to the operation of the scheme. That agreement directly enabled Abedi, Naqvi, and Akbar to conduct numerous fraudulent transactions, and to disguise those transactions from the public. Khalil's consent to act as an all-purpose nominee was a direct and proximate cause in disguising these frauds, preventing regulators from closing down the bank earlier and minimizing the damage to the BCCI Group. As a result of these violations, the BCCI Group sustained a loss of assets that were squandered in these fraudulent transactions.

■ The Liquidators are entitled to judgment on Count II insofar as it alleges a violation of § 1962(d). The Liquidators divided the Treasury losses into three amounts: $62,021,193 for losses on silver and copper trading involving and facilitating accounts in Khalil's name; $614,000,000 from other losses; and $327,899,820 as the net additional loss after subtracting other categories of damages already accounted for. While it was smooth sailing for much of the Liquidators' proof on liability, their assertion of the latter two categories of damages founder on the shoals of the proximate cause requirement. The Court finds that the $62,021,193 is directly linked to the use of Khalil's name and the name of his companies. Although market conditions played an important role in bringing those losses about, the use of Khalil's name remained a substantial factor causing those losses. These losses can be traced directly to the fraudulent use of Khalil-owned companies.

By contrast the other losses involved numerous additional factors outlined in the cross examination of Mr. Morris and covered a considerably longer period. The nexus between Khalil's agreement that his name be used and the $614,000,000 and $327,899,820 amounts is simply too remote.

Additionally, the Liquidators sought damages of $19,852,095 for the BCCI Holdings shares bought in Khalil's name. BCCI loaned itself this amount. Although the evidence was clear that Khalil was not responsible for repayment of these loans, the Liquidators ask that for purposes of damage calculations, the Court treat these as real obligations. The Liquidators cited no authority for the proposition that a Court can find a transaction to be fraudulent for liability purposes and *bona fide* for purposes of calculation of damages.

As was the case with Khalil's service as a nominee for the First American acquisition, the Court finds that the damages directly attributable to Khalil's agreement to serve as a BCCI nominee were those direct payments to Khalil and the payment of his considerable expenses.

**COUNT III:** OPERATION OF CAPCOM

Count III also alleged a violation of § 1962(c). Here, the enterprise is Capcom UK and its subsidiaries. On this count, Khalil is both directly liable and liable as a § 1962(d) conspirator.

■ Like BCCI and First American, Capcom UK, with its subsidiaries Capcom U.S. and Brenchase Limited, was an enterprise. Capcom represented the formal incorporation of a partnership between Khalil and Akbar. Khalil and Akbar conspired to, and operated, Capcom through a pattern of racketeering activity, causing injury to the BCCI group in violation of § 1962(c). Capcom's capital and trading funds were obtained from BCCI by Akbar, with Khalil's knowledge, consent, and participation. Akbar, also with Khalil's knowledge and consent, further caused Capcom to engage in circular routing transactions for the purpose of assisting in the falsification of BCCI's books and records in order to hide non-performing assets.

Khalil was a significant shareholder and director of Capcom. With Akbar, he controlled a majority of the shares of Capcom in his own name and through nominees. Although Akbar was not a registered shareholder or director of Capcom UK until 1987, at all times from its inception, Akbar was the principal manager, through

other individuals, of Capcom UK. As a director, Khalil kept his distance from many day-today decisions, but he also directly participated in the operation and management of Capcom in a number of dealings, including Capcom's relationship with BCCI and the restructuring of Capcom Chicago's shareholding. Consequently, both Khalil and Akbar conducted, and participated in the conduct of, Capcom's affairs within the meaning of § 1962(c).

Additionally, Khalil individually, and through Akbar, engaged in acts of racketeering including (a) wire and mail fraud in violation of 18 U.S.C. §§ 1341 and 1343; (b) travel or transportation in aid of racketeering in violation of 18 U.S.C. § 1952; (c) money laundering in violation of 18 U.S.C. § 1956; and (d) extortion in violation of D.C.Code Ann. § 22–3851 and 18 U.S.C. § 1951.

Numerous fraudulent transactions through which funds were siphoned from BCCI's treasury were completed through use of interstate and international wires, including wire transfers of United States dollars cleared through accounts in financial institutions in the United States. These acts were vital to Khalil and Akbar's operation of Capcom in that they permitted and effected the transfer of funds from BCCI to Capcom to fund Capcom's trading activities, and to hide BCCI losses and non-performing assets.

Khalil and Akbar also violated 18 U.S.C. § 1952(a) through their respective travel to the United States in 1987–88. Khalil traveled from abroad to Illinois in August 1987 to handle Capcom business, including the restructuring of Capcom UK's shareholding in Capcom US. Akbar traveled from abroad to the District of Columbia and New York to undertake business transactions on behalf of the Capcom enterprise.

Khalil, acting singly and in concert with other defendants, transferred funds from accounts abroad to the United States and from the United States to accounts abroad with the intent to promote the carrying on of their scheme to loot BCCI for the benefit of Capcom and to disguise the nature, source, ownership and control of the proceeds of their unlawful activity in violation of 18 U.S.C. § 1956(a)(1) & (2). In the course of conducting the Capcom enterprise, defendants also violated D.C.Code Ann. § 22–3851 and/or 18 U.S.C. § 1951 by extorting the property of the BCCI Group.

The racketeering activities described above were undertaken for the common purpose of furthering Khalil and Akbar's fraudulent scheme to obtain surreptitiously substantial sums from BCCI and to utilize Capcom to falsify BCCI's books and records. These acts were part of a recurring pattern of activity which continued from 1984 until at least 1988. These acts were essential elements, or incident to essential elements, of Khalil and Akbar's scheme and constituted a pattern of racketeering. Although Khalil signed papers in early 1988 making it appear as if he had transferred his interest in Capcom to Akbar, Khalil maintained his beneficial interest in Capcom through nominee shareholders. Moreover, even if Khalil had intended to withdraw from the conspiracy, his actions were insufficient to communicate that withdrawal. *Cf. Antar*, 53 F.3d at 582–84.

As a direct and proximate result of Khalil and Akbar's scheme to conduct the affairs of Capcom through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c) and (d), the BCCI Group and their innocent creditors and depositors were injured in their business and property, as contemplated by 18 U.S.C. § 1964(c). As a result of these violations, the BCCI Group sustained a loss of assets that were acquired and converted by defendants in these fraudulent transactions and sustained a further loss of assets in meeting defendants' extortion demands.

**COUNT IV: Investment in Capcom**

Count IV alleges a violation of § 1962(a). This section embodies Congress's central objective in 1970 to address the infiltration of legitimate businesses by members of

organized crime using funds derived from illegal enterprises. *See* Gerald E. Lynch, *RICO: The Crime of Being a Criminal, Parts I and II*, 87 COLUM.L.REV. 661, 676–78 (1987). It provides in pertinent part:

It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of [18 U.S.C. § 2], **to use or invest directly or indirectly, any part of such income, or the proceeds of such income, in acquisition** of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

18 U.S.C. § 1962(a). However, because of the multiple elements that must be satisfied to prove a violation, this section is applied relatively infrequently. *See* Lisa Pritchard Bailey et al., *Racketeer Influenced and Corrupt Organizations in Project, Fourteenth Survey of White Collar Crime*, 36 AM.CRIM.L.REV. 1035, 1058 & nn. 175–76 (1999).

■■■ Count IV alleges that Khalil and Akbar conspired to, and did, violate § 1962(a) by receiving income from BCCI through a pattern of racketeering activity and using those funds to establish and operate Capcom. For the reasons stated above, and for those additional reasons cited in the Liquidators' Proposed Findings and Conclusions, the Court holds that Khalil and Akbar conspired to, and did, violate § 1962(a) by siphoning funds from BCCI and channeling them into Capcom. However, § 1964(c) additionally requires that the Liquidators show that the BCCI Group entities were injured "by reason of" the § 1962(a) violation; that is, that their "injury flowed from the defendant's use or investment of racketeering income." *Danielsen*, 941 F.2d at 1229; *see also Sadighi v. Daghighfekr*, 1999 WL 38430 *20 n. 9 (D.S.C. Jan.22, 1999) (collecting cases). The Liquidators did not carry their burden

to demonstrate injury proximately flowing from Khalil and Akbar's use or investment of funds funneled from BCCI's treasury into Capcom.

## COMMON LAW COUNTS

In addition to the above-discussed RICO counts, the Liquidators asserted three claims under the common law of the District of Columbia, seeking liability for Khalil's role as a nominee for BCCI and for his role in Capcom. The Court has some reservations about these claims. While Khalil's role in facilitating BCCI's takeover of First American plainly made him subject to the common law of District of Columbia, the nexus to the District of Columbia as to some of the other conduct is rather remote. The BCCI Treasury scheme involved fraudulent transfers through accounts in New York; the Capcom scheme touched ground in New York, Illinois, and elsewhere.

Rather than quilting together the law of various jurisdictions in the United States to cover Khalil's roles in these schemes, the Liquidators alleged that District of Columbia law applied to all of Khalil's conduct. Khalil's Proposed Findings and Conclusions raise no choice-of-law issues, also proposing that District of Columbia law properly be applied to Counts V–VII. Any objections to the application of District of Columbia law have been waived. *See CSX Transportation, Inc. v. Commercial Union Ins. Co.*, 82 F.3d 478, 482–83 (D.C.Cir.1996).

### COUNT V: FRAUD

■■■ Under the common law of the District of Columbia, a plaintiff alleging fraud must prove five elements: (1) a false representation, (2) in reference to a material fact, (3) made with knowledge of its falsity, (4) with intent to deceive, and (5) on which reliance is placed. *D'Ambrosio v. Colonnade Council of Unit Owners*, 717 A.2d 356, 361 (D.C.1998). These elements must each be proven by clear and convincing evidence. *Hercules & Co., Ltd. v. Shama*

64

*Restaurant Corp.*, 613 A.2d 916, 923 (D.C. 1992).

■ An actionable representation is made either by an affirmative representation or the "concealment of a fact which should have been disclosed." *Jacobs v. District Unemployment Compensation Board*, 382 A.2d 282, 286 n. 4 (D.C.1978); *accord Andolsun v. Berlitz Schools of Languages of America, Inc.*, 196 A.2d 926, 927 (D.C.1964); *Reed v. Philip Morris Inc.*, 1997 WL 538921 at * 6 (D.C. Super. Aug.18, 1997). Mere silence is not a false representation unless there is a duty to speak. *See Kapiloff v. Abington Plaza Corp.*, 59 A.2d 516, 517–18 (D.C.1948). A duty to speak arises either by operation of law in fiduciary relations or otherwise where the circumstances so warrant. *See, e.g. Andolsun*, 196 A.2d at 927 (party's foreseeable reliance gave rise to duty to speak); *Kapiloff*, 59 A.2d at 518 (truthful statements with material omissions are actionable misrepresentations).

■ The knowledge-of-falsity element requires either subjective knowledge that the statement was false or reckless disregard for the statement's truth. *See Jacobs*, 382 A.2d at 287 (using common law standard to interpret statutory fraud provision); *see also* RESTATEMENT (SECOND) OF TORTS § 526 cmt. e (1977) (reckless disregard is shown where speaker "recognizes that there is a chance, more or less great, that the fact may not be as it is represented."). Finally, under the reliance element, at least in arms-length dealings, the reliance must be reasonable. *Hercules & Co., Ltd. v. Shama Restaurant Corp.*, 613 A.2d 916, 923 (D.C.1992).

■ The Liquidators have established that Khalil participated in a scheme to misrepresent transactions which were then recorded by his co-conspirators on the books and records of BCCI. The misrepresentations resulted in the recording on BCCI's books as loans certain transactions which in fact were not loans at all, but rather were gratuitous transfers to Khalil.[39] In reliance on these misrepresentations as to the purpose of these transactions, the BCCI Group corporations were caused to fund illegal investments in First American, BCCI Holdings and Capcom shares. BCCI's books were also falsified in that non-performing loans were shown to be performing, preventing BCCI from making a true calculation of its profits, losses and ultimate value. BCCI also funded, through overdraft accounts which in fact Khalil had no obligation to repay, personal and business expenses for Khalil, including property purchases, purchases of art objects and antiquities for Khalil's private museum and payment of travel expenses for Khalil and his family.

### COUNT VI: UNJUST ENRICHMENT

■ Count VI alleges that Khalil was unjustly enriched by the benefits he extracted from BCCI. The doctrine of unjust enrichment has at all times been fundamentally equitable in nature, notwithstanding its long association with the law of contracts. *See Emerine v. Yancey*, 680 A.2d 1380, 1383–84 (D.C.1996); *4934, Inc. v. District of Columbia*, 605 A.2d 50, 55–56 (D.C.1992); *cf. Ellsworth Assoc., Inc. v. United States*, 917 F.Supp. 841, 846 (D.D.C.1996) (unjust enrichment "sound[s] in tort, not contract").

■ To qualify for an award of restitution under this theory, the plaintiff must show that she conferred a benefit (usually money) on defendant under circumstances

---

39. The Liquidators have further proven that Khalil committed other fraudulent acts. He read a statement to the Federal Reserve in connection with the takeover of First American in which he represented that he would be investing funds to acquire First American and that his personal wealth would be part of the "financial resources of the Investor group" purporting to be the new owners of the bank. *See* Pls.' Ex. 330. The statement was false and proximately caused BCCI to violate United States law. None of Khalil's funds were used to purchase First American, and the Federal Reserve reasonably relied on the statement in approving the transaction.

in which it would be unjust or inequitable for the defendant to retain the benefit. *Id.* at 1383; *4934, Inc.*, 605 A.2d at 55.

Because of the doctrine's equitable nature:

[E]very unjust enrichment case is factually unique, for whether there has been unjust enrichment must be determined by the nature of the dealings between the recipient of the benefit and the party seeking restitution, and those dealings will necessarily vary from one case to the next.

*4934, Inc.*, 605 A.2d at 55.

■ On the unique facts of this case, there is no question that Khalil has been unjustly enriched to the tune of millions in the keys of dollars, pounds and riyals. Khalil received numerous benefits, including direct payments, and payment of personal and business expenses, such as property purchases, purchases of art objects and antiquities for his private museum, and payment of travel expenses for himself and his family. He was aware that these benefits were provided by BCCI and that he did not pay for the benefits because he received monthly account statements which indicated that no debits had been made to his accounts. On the facts of this case, it would be inequitable for defendant to benefit from BCCI's payments on his behalf.

## COUNT VII: CONVERSION

■ Count VII alleges that Khalil converted substantial sums obtained from BCCI for his own use. Conversion occurs when a defendant unlawfully exercises ownership, dominion or control over the personal property of another in denial or repudiation of his rights thereto. *Duggan v. Keto,* 554 A.2d 1126, 1137 (D.C.1989); *see also Primedical, Inc. v. Allied Inv. Corp.,* 1994 WL 149139 *7 (D.D.C. Mar.31, 1994), *aff'd,* 50 F.3d 1096, 1995 WL 116263 (D.C.Cir.1995).

Without elaboration or discussion, the Liquidators argue that the sums Khalil extorted from BCCI should be awarded as damages on Count VII. In addition, the Liquidators argue that Khalil's expenses paid for by BCCI also were converted, presumably on the theory that Khalil was obliged to repay these amounts and never did. Finally, the Liquidators assert that the sums Khalil and Akbar siphoned from BCCI were converted by them.

■ As to the amounts extorted, there appears some doctrinal tension between the elements of extortion and conversion. Extortion requires the "obtaining of property from another with his consent" where that "consent" is induced by a threat. *See* 18 U.S.C. § 1951. Conversion requires the exercise of dominion in repudiation of the rightful owner's rights. A consensual transfer generally invalidates a conversion claim. *See Equity Group, Ltd. v. Paine-Webber Inc.,* 48 F.3d 1285, 1286 (D.C.Cir. 1995) (plaintiff's "valid consent to the transfer means there was no conversion"). It may be that a consensual transfer induced by a threat is not consensual for purposes of a common law conversion claim in the District of Columbia, but the Liquidators have cited no authority for that proposition.

Separately, the Liquidators have not addressed whether extortionate conduct is directly actionable in tort. *Compare Clark v. World Airways, Inc.,* 1980 WL 271 * 1 (D.D.C. Oct.24, 1980) (no "tort of extortion" existed at common law) *with Hart v. E.P. Dutton & Co.,* 197 Misc. 274, 93 N.Y.S.2d 871, 874 (N.Y.Sup.Ct.1949) (referring to a tort "action for extorting money by threats") (citing Salmond on the Law of Torts 194 (8th ed.)); *cf.* James Lindgren, *The Elusive Distinction Between Bribery and Extortion: From the Common Law to the Hobbs Act,* 35 UCLA L.Rev. 815, 852 (1988) (citing a 1620 example in which a conversion was predicate for extortion charge). Accordingly, the Court will not award the $27.5 million extorted by Khalil as damages on Count VII.

As to the amounts paid for Khalil's expenses, the elements of conversion have not been met. BCCI willingly paid Khalil's expenses for his service as a nominee. Khalil was under no obligation to repay these amounts to BCCI.

However, the Court finds that Khalil is liable on Count VII for those funds siphoned from the BCCI Treasury to fund Capcom. By transferring those funds from BCCI without authorization, Akbar and Khalil, as his partner, exercised unlawful dominion over those funds and converted them to their own use.

## DAMAGES

As a result of the schemes set forth above, Khalil received substantial benefits from BCCI. The benefits were conferred in payment for Khalil's participation in the nominee scheme and in response to demands from Khalil. The benefits were in the form of direct payments to Khalil, payments of Khalil's expenses, payments to Khalil owned companies.

### A. Direct Payments to Khalil—$27,500,000

Pursuant to the schemes described above, BCCI made direct payments to Khalil of $27,500,000. In 1986, at Akbar's direction and with Naqvi's ratification, Khalil received a check for $12,500,000. Then, in July 1987, BCCI made a final direct payment to Khalil of $15,000,000. That payment was made using international and United States wire facilities. Pursuant to the nominee conspiracy, BCCI was obliged to pay Khalil some amount for his service as a nominee. Khalil used his economic leverage and threats of exposing the scheme to extort larger direct payments than BCCI would have otherwise paid pursuant to the nominee arrangements. It would be unjust to allow Khalil to keep these funds. As a result of these payments, the Liquidators are entitled to recover $27,500,000 either as damages on Counts I, II or V, or as restitution under Count VI.

### B. Payments of Expenses—$15,249,283

For Khalil's participation in the schemes described above, BCCI paid expenses totaling $15,249,283 for the acquisition and maintenance of properties, the purchase of antiquities, and travel and living expenses paid by BCCI. As was detailed in Gilkes's testimony, $2,249,352 was paid by BCCI for expenses arising from the acquisition and maintenance of Khalil-owned properties in the United States and United Kingdom. BCCI paid a total of $3,073,092 to acquire art and antiquities for Khalil. BCCI also paid an additional $9,926,839 to cover Khalil's credit card bills, advances to his son, and other miscellaneous expenses. These payments were made to Khalil for his nominee role both as to BCCI and First American. There was no commercial advantage in BCCI's providing this "VIP service" to Khalil, and it would be unjust to allow him to retain this sum. Accordingly, the Liquidators are entitled to recover $15,249,283 either as damages on Counts I, II, or V, or as restitution under Count VI.

### C. Payments to Khalil–Owned Companies—$47,069,808

In addition to direct payments, Khalil also benefitted from $47,069,808 in payments made by BCCI to companies he owned with his co-conspirator, Akbar. Between May and November 1984, Akbar caused BCCI to make payments totaling $5,069,808 to Capcom UK. Neither Naqvi nor Abedi ratified this payment. Then, on June 17, 1985, BCCI made a further payment to Capcom UK of $25,000,000 by the use of international and United States wire facilities.

Finally, between June and October 1987, as a result of Khalil's intervention with Naqvi, BCCI engaged in a series of transactions, using international and United States wire facilities, resulting in a payment of $17,000,000 to General Securities

Corporation ("GESS"), a company created by Akbar and jointly owned by Akbar and Khalil. *See* Tr. (Gilkes) at 207–12. This was to have been a loan, but the loan was never repaid. Neither the direct payments to Khalil, the payments to his companies, nor the payments of his expenses were made using Khalil's deposits and accumulated interest at BCCI. *Id.* at 246–47. The Liquidators are entitled to recover $47,069,808 as damages under either Counts III or VII, or as restitution on Count VI.

### D. Additional Payments to Capcom—$236,562,250

As a result of the schemes described above, between 1984 and 1986, Akbar caused BCCI to send $236,562,250 to Capcom, and that amount was never repaid to BCCI. Tr. (Gilkes) at 277–83. Most of these payments from BCCI to Capcom were made using international and United States wire facilities. The Liquidators are entitled to recover $236,562,250 as damages under either Counts III or VII, or as restitution on Count VI.

### E. Treasury Losses—$62,021,193

As a direct result of the silver and copper trading involving and facilitated by accounts in Khalil's name, BCCI suffered losses of $62,021,193. Tr. (Gilkes) at 306–07. The Liquidators are entitled to recover this amount as damages under either Count II or Count V.

#### PREJUDGMENT INTEREST

The Liquidators seek recovery of prejudgment interest for the damages awarded on both the RICO and the common law counts. As a general matter, "prejudgment interest serves to compensate for the loss of money due as damages from the time the claim accrues until judgment is entered, thereby achieving full compensation for the injury those damages are intended to redress." *West Virginia v. United States*, 479 U.S. 305, 310 n. 2, 107 S.Ct. 702, 93 L.Ed.2d 639 (1987); *see also generally* Michael S. Knoll, *A Primer on Prejudgment Interest*, 75 TEX.L.REV. 293 (1996) (analyzing the options for, and mechanics of, accomplishing the goal of full compensation).

As to the RICO damages, there is a threshold question as to whether prejudgment interest is even available. Congress patterned 18 U.S.C. § 1964(c) after the Clayton Act. *See Klehr*, 521 U.S. at 188–89, 117 S.Ct. 1984. Like the Clayton Act, RICO entitles a successful plaintiff to have her actual damages trebled. However, unlike the Clayton Act, which expressly authorizes prejudgment interest, RICO is silent as to the availability of prejudgment interest. *See* G. Robert Blakey & Thomas A. Perry, *An Analysis of the Myths That Bolster Efforts to Rewrite RICO and the Various Proposals for Reform: "Mother of God—Is This the End of RICO?"* 43 Vand. L.Rev. 851, 968 & nn. 383–84 (1990) (proposing that RICO be amended to authorize prejudgment interest awards). Congress has previously considered a bill to allow recovery of prejudgment interest. *See* James P. Kennedy, *Civil RICO in the Antitrust Context*, 55 Antitrust L.J. 463, 491 (1986) (summarizing provisions of H.R. 5290, 101st Cong., 2d Sess. (1986)). If prejudgment interest is available, a question arises as to whether prejudgment interest also is trebled. *See* Judith A. Morse, Note, *Treble Damages Under RICO: Characterization and Computation*, 61 Notre Dame L.Rev. 526, 546 (1986). The Court will assume, without deciding, that prejudgment interest is available for awards under § 1964(c).

██ As to the damage award on the common law counts, District of Columbia law controls. *See Schneider v. Lockheed Aircraft Corp.*, 658 F.2d 835, 855 (D.C.Cir. 1981). In an action sounding in tort, District of Columbia law permits the award of prejudgment interest "to the extent that it will make the injured party whole." *Duggan v. Keto*, 554 A.2d 1126, 1140 (D.C. 1989); D.C.CODE ANN. § 15–109 (1981). The Court will assume, without deciding,

that prejudgment interest also would be available for an award of restitution on a claim of unjust enrichment.

 Where prejudgment interest is neither prohibited nor mandatory, the decision to award prejudgment interest is committed to the sound discretion of the district court. *See Frederick County Fruit Growers Ass'n v. Martin*, 968 F.2d 1265, 1275 (D.C.Cir.1992). The exercise of that discretion is guided by consideration of "[1] whether prejudgment interest is necessary to compensate the plaintiff fully for his injuries; [2] the degree of personal wrongdoing on the part of the defendant; [3] the availability of ... investment opportunities to the plaintiff; [4] whether the plaintiff delayed in bringing or prosecuting the action; and [5] other fundamental considerations of fairness." *See Osterneck v. Ernst & Whinney*, 489 U.S. 169, 176, 109 S.Ct. 987, 103 L.Ed.2d 146 (1989).[40] In essence, the trial court must determine whether it is fair to treat the defendant as plaintiff's banker, with the plaintiff's damages having been on deposit with the defendant from the time plaintiff's claim accrued.

 In this case, the need to fully compensate the innocent depositors and creditors of BCCI, who will benefit from the damages awarded in this case, favors an award of prejudgment interest. However, other factors weigh against such an award. Khalil was a knowing and willful participant in the activities leading to the damages awarded herein, but his culpability was relatively less than that of Akbar, Abedi, and Naqvi. Khalil is partially responsible for the delay in the resolution of this dispute, but other factors also contributed to that delay. The considerations on both sides of the scale are weighty, but ultimately the Court concludes that in light of the unique circumstances of this case a

prejudgment interest award would be unfair to Khalil.

## CONCLUSION

Accordingly, for the reasons stated, it is hereby

**ORDERED** that judgment in favor of the Liquidators and against defendant Khalil shall be entered in the amount of $42,749,283 on Count I (*see supra* at 107–08 categories A and B); it is

**FURTHER ORDERED** that judgment in favor of the Liquidators and against defendant Khalil shall be entered in the amount of $104,770,476 on Count II (*see supra* at 107–09 categories A, B, and E); it is

**FURTHER ORDERED** that judgment in favor of the Liquidators and against defendant Khalil shall be entered in the amount of $326,381,341 on Count III (*see supra* at 108–09 categories C and D); it is

**FURTHER ORDERED** that judgment in favor of defendant Khalil shall be entered on Count IV.

**FURTHER ORDERED** that judgment in favor of the Liquidators and against defendant Khalil shall be entered in the amount of $104,770,476 on Count V (*see supra* at 107–09 categories A, B, and E); it is

**FURTHER ORDERED** that judgment in favor of the Liquidators and against defendant Khalil shall be entered in the amount of $326,381,341 on Count VI (*see supra* at 107–09 categories A, B, C, and D); it is

**FURTHER ORDERED** that judgment in favor of the Liquidators and against defendant Khalil shall be entered in the amount of $283,632,058 on Count VII (*see supra* at 108–09 categories C and D); it is

**FURTHER ORDERED** that the total, non-duplicative amount to which the Liqui-

---

40. While the Supreme Court articulated these factors in the context of a damages award for federal securities fraud, these factors are clearly of more general applicability. In any event, the facts of this case are sufficiently analogous to securities fraud to make application of the *Osterneck* factors appropriate.

dators are entitled on Counts I, II, III, V, VI, and VII is $388,402,534 (*see supra* at 107–09 categories A through E). Pursuant to 18 U.S.C. § 1964(c) that amount is trebled to total $1,165,207,602; it is

**FURTHER ORDERED** that if the Liquidators seek attorneys' fees and costs, a motion to that effect shall be filed not later than 30 days after the issuance of the mandate from the Court of Appeals, if any appeal be taken, or from the date on which the time for filing an appeal expired; it is

**FURTHER ORDERED** that a hearing on the Liquidators' motions for default judgment shall be held on **July 15, 1999** at **9:30 a.m.;** and it is

**FURTHER ORDERED** that the Court anticipates entering her Rule 58 judgment on or about **July 15, 1999.**

IT IS SO ORDERED.